IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

04 MAR 31  PM 3: 17

U.S. ...
N.D. OF ALABAMA

| | |
|---|---|
| JIMMY DILL, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 01-B-0558-S |
| | ) |
| MICHAEL HALEY, Commissioner, | ) |
| Alabama Department of Corrections, | ) |
| | ) |
| Defendants. | ) |

**ENTERED**

MAR 3 1 2004

## MEMORANDUM OF OPINION

Jimmy Dill, hereinafter referred to as petitioner, filed this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Dill is represented by counsel.

## PROCEDURAL BACKGROUND

On May 25, 1989, Dill was convicted of capital murder in the Circuit Court of Jefferson County. One hour later, Dill appeared before the same jury for sentencing, and the jury recommended a sentence of death by a vote of 11-1. On July 14, 1989, the trial court sentenced Dill to death by electrocution. Dill's conviction was affirmed on direct appeal on May 31, 1991, and the Alabama Court of Criminal Appeals denied the petition for rehearing. *Dill v. State*, 600 So. 2d 343 (Ala. Crim. App. 1991). The Alabama Supreme Court granted Dill's petition for writ of certiorari but subsequently affirmed the opinion of the Alabama Court of Criminal Appeals and denied Dill's application for rehearing. *Ex parte Dill*, 600 So. 2d 372 (Ala. 1992). On November 9, 1992, Dill filed a petition to the Supreme Court of the United States for a writ of certiorari to the Supreme Court of Alabama. The United States Supreme Court denied Dill's petition on February 22, 1993. *Dill v. Alabama*, 507 U.S. 924 (1993).

25

On July 1, 1994, Dill filed a petition for relief from conviction and sentence under Rule 32 of the Alabama Rules of Criminal Procedure in the Circuit Court of Jefferson County. On September 14, 1994, the circuit court denied the petition without conducting an evidentiary hearing. Dill appealed from the denial of the Rule 32 petition, and the Alabama Court of Criminal Appeals remanded the case for an evidentiary hearing on the ineffective assistance of counsel claims. *Dill v. State*, 717 So. 2d 826 (Ala. Crim. App. 1995). On September 13, 1996, counsel for Dill and counsel for the state appeared before the trial judge. Dill was not present apparently because counsel had not requested his presence. No witnesses were called by either side. Affidavits of Abbie Dill, Angela Johnson Whaley, Archie Dill, Caroline Elaine Dill, Leonard Dill and Lee Henry Dill were presented by Dill on the issue of counsel's alleged failure to present mitigating evidence at Dill's sentencing hearing. Dill apparently did not attempt to have either of his trial attorneys present. As a consequence, counsel did not testify at the Rule 32 hearing either in person or by affidavit. Despite the fact that the matter had been remanded for an evidentiary hearing, it is the state's position that:

> There was no Rule 32 evidentiary hearing in this case. Dill's attorneys submitted their evidence in this case through affidavits. The hearing to which Dill refers was actually a motion hearing and argument on the parties' positions concerning the claims in the Rule 32 petition.

(Answer to the amended petition for writ of habeas corpus, p. 2).[1]

On October 9, 1996, the trial judge entered an order denying relief and the issue was resubmitted to the Court of Criminal Appeals. On March 26, 1999, the Alabama Court of Criminal Appeals affirmed the judgment of the Rule 32 court. *Dill v. State*, 767 So. 2d 366 (Ala. Crim. App. 1999).

---

[1] For reasons more fully set forth below this characterization of the proceeding appears to be correct.

The application for rehearing was denied on June 18, 1999. The Alabama Supreme Court denied the petition for writ of certiorari on March 31, 2000 and a certificate of judgment was issued. The federal petition for writ of habeas corpus before this court was filed on March 30, 2001.

FACTS OF THE CASE

On direct appeal, the Alabama Court of Criminal Appeals recited the facts of this case:

> Jimmy Lee Dill was indicted for capital murder in violation of § 13A-5-40(a)(2), Code of Alabama 1975. He was found "guilty as charged in the indictment" and was sentenced to death. The record reveals that the victim, Leon Shaw, drove to Terry Dill's house on the afternoon of February 8, 198[8]. Shaw was not supposed to be driving because he was serving time at the Federal Work Release Center for a drug violation. Shaw was, however, allowed to leave the center to go to work. He operated the Rose Boutique, which he owned with his wife, Junatha Shaw. Terry Dill left the house and got in the car with Shaw. The appellant was in the front seat with Shaw. Shaw told Terry Dill that the appellant wanted to buy drugs from Shaw.
>
> The testimony reveals that Terry Dill was a former cocaine addict who had sold cocaine with Shaw for four years. Shaw would pay Terry Dill to bring him customers.
>
> Shaw, Dill, and the appellant ran into Jacqueline Ball and Freddie Carter near a church on 85th Street. Shaw was still driving the car and Terry Dill was sitting in the backseat behind him. The appellant was still in the front passenger seat. Apparently, Shaw and the appellant got out of the car. Shaw talked to Jacqueline Ball, and the appellant talked to Freddie Carter. Shaw was carrying a black pouch in which he normally kept cocaine and money. Shaw had at least $200 in his hand.
>
> After Ball and Carter left, the appellant asked Shaw if he would give him some cocaine until he could get the money to pay for it. Shaw refused. They left for

3

Druid Hills, where the work release center was located, because Shaw had to sign in at the center. When they got to Druid Hills, Shaw's beeper went off. They all got out of the car and Shaw made a telephone call. They went to the Curb Market and Shaw bought wine coolers. Shaw had a "folded wad of money." (R. 481.) When they left the store, Shaw had everyone in the car switch places so that the people at the center would not see him driving. Terry Dill was now driving and the appellant was in the backseat. Terry Dill drove to the center.

The appellant again asked Shaw for cocaine. Shaw told him that he would give him the cocaine when the appellant got some money. He also showed the appellant a half ounce of cocaine. The appellant asked for cocaine again when they pulled up to the center. Shaw went to the building. He pulled a "big wad of money" out of his pocket. (R. 395.) There was so much money that it could not be rolled up. He told the case manager at the center that he had just left the Rose Boutique and was going to make a deposit.

While Shaw was inside the center, the appellant said to Terry Dill, "You don't believe I'll rob him or shoot him." (R. 490.) The appellant continued to talk about killing Shaw. When Shaw got back in the car, the appellant said that he would shoot Shaw if he did not give him some cocaine. After they drove off, there was a gunshot. Blood spurted onto Terry Dill. The appellant had a small automatic pistol, approximately .25 or .22 caliber. The appellant told Terry Dill to be quiet and keep driving. The appellant pulled the trigger as if he was going to shoot Shaw again. They eventually stopped in an alley. The appellant searched Shaw and took the money and cocaine. The appellant then got a rag and started wiping fingerprints off the car. Terry Dill ran away. The appellant also ran away. Terry Dill called his girlfriend to pick him up. He went home later that evening.

Shaw was taken to the hospital where emergency brain surgery was performed. The bullet entered the left, back side of his brain. Shaw was unconscious.

4

He had abnormal movement in his extremities which indicates that the brain is functioning extremely abnormally. Both a feeding tube and breathing tube were inserted. He was discharged from the hospital on April 26, 198[8], because there was nothing more the hospital could do for him. Shaw could not function independently and required round-the-clock care. Shaw eventually pulled the feeding tube out. However, his doctor said he would not replace the tube since he could eat and drink by mouth. Shaw was readmitted to the hospital on October 31, 198[8]. He never regained consciousness and died on November 22, 198[8]. Shaw's doctors testified that he died of complications from a gunshot wound to the head.

Forensic evidence revealed that the bullet removed from Shaw's head was consistent with a .22 caliber projectile. The characteristics of the wound were consistent with a contact gunshot wound.

The appellant gave a statement to the police on February 18, 198[8]. He stated that he and Terry Dill were with Shaw and that they drove to North Birmingham. Terry Dill was driving the car, Shaw was on the front passenger seat, and the appellant was in the backseat behind Terry Dill. The appellant stated that Shaw's door opened and that he heard a shot from behind Shaw. The appellant was then asked how Shaw was shot from behind without the window being shot out of the car. The appellant then stated that Shaw was actually getting into the car when someone ran up to Shaw's door. The appellant stated that he heard a gunshot. He and Terry Dill got out and ran. The appellant then stated that after hearing the shot, they drove off and a car followed them. They drove to an alley, jumped out of the car, and ran away. The appellant stated that Shaw had some cocaine in a black bag but he did not see any money.

5

*Dill v. State*, 600 So. 2d 343, 350-51 (Ala. Crim. App. 1991), *aff'd*, *sub nom. Ex Parte Dill*, 600 So. 2d 372 (Ala. 1992), *cert denied*, 507 U.S. 924 (1993).[2]

The 2254 CLAIMS[3]

In his federal habeas petition, petitioner raises the following claims:

A.     Ineffective assistance of trial counsel[4]

B.     Prosecutorial Misconduct

C.     Failure to grant a mistrial due to the investigating police officer's prejudicial reference to the defendant's prior criminal record

D.     Prosecutor's peremptory challenges were racially biased

E.     No claim was submitted as claim E

G.     The inclusion of a jury member who was related to the trial judge

F.     The state failed to turn over investigative materials regarding an investigation into whether or not Ms. Shaw, the victim's wife, purposefully or negligently caused the victim's death.[5]

---

[2]     The Alabama Court of Criminal Appeals mistakenly indicated that the shooting, Dill's statement, the victim's release from the hospital, the victim's readmission to the hospital and the victim's death occurred in 1989 when in fact all of these events occurred in 1988.

[3]     As a matter of internal organization each claim is addressed below with the corresponding state proceeding in which the claim was made, if in fact it was, identified.

[4]     The court will use the same numbered identification method of the ineffective assistance of counsel claims used by the state in its answer as this method more clearly identifies the discrete claims raised by petitioner. Specifically, the state identifies seventeen ineffective assistance of counsel claims based on its review of the amended petition. Petitioner has not indicated that the state failed to include or address any ineffective assistance of counsel claims raised.

[5]     Claims G and F were reversed in the amended habeas petition.

APPLICABLE LAW:      WHERE CLAIM WAS ADJUDICATED
<u>ON THE MERITS IN STATE COURT</u>

Title 28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Title 28 U.S.C. § 2254(e)(1) provides:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

In *Washington v. Crosby*, 324 F.3d 1263 (11th Cir. 2003), *cert. denied,* ___ U.S. ___, 124 S. Ct. 429, 157 L. Ed. 2d 309 (2003), the Eleventh Circuit Court of Appeals explained:

> A state court decision is "contrary to" the Supreme Court's clearly established precedent if (1) it applies a rule contradicting the governing law as set forth by Supreme Court case law, or (2) the state court, in a case with facts indistinguishable from those in a decision of the Supreme Court arrives at a different result. *Bottoson v. Moore*, 234 F.3d 526, 531 (11th Cir. 2000), *cert. denied,* 534 U.S. 956, 122 S.Ct. 357, 151 L.Ed.2d 270 (2001). "A state court decision involves an unreasonable application of Supreme Court precedent "if the state court identifies the

7

> correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case.'" *Id.* (quoting *Williams v. Taylor*, 529 U.S. 362, 407, 120 S.Ct. 1495, 1520, 146 L.Ed.2d 389 (2000)). The Supreme Court cautioned that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 US. at 411, 120 S.Ct. at 1522.

324 F.3d at 1265.

A.    <u>Ineffective Assistance of Counsel Claims</u>

APPLICABLE LAW

The principles in *Strickland v. Washington*, 466 U.S. 668 (1984), govern all ineffective assistance of counsel claims. The state courts' decisions in this case were not "contrary to" clearly established federal law as determined by the United States Supreme Court  because both the trial court and the Alabama Court of Criminal Appeals recognized that *Strickland* was the controlling law with respect to ineffective assistance of counsel claims.

In *Strickland* the United States Supreme Court established a national standard for judging the effectiveness of criminal defense counsel.  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686. The Court elaborated:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the

8

> > defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687.

In reviewing the performance prong of *Strickland*, the Court stated:

> > In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.

*Id.* at 688-89.

In *Crawford v. Head*, 311 F.3d 1288 (11th Cir. 2002), *cert. denied*, ___ U.S. ___, 124 S. Ct. 408, 157 L. Ed. 2d 293 (2003), the Eleventh Circuit Court of Appeals elaborated on the *Strickland* performance prong:

> > [W]e must bear in mind that the "touchstone of a lawyer's performance under the Constitution" is "reasonableness." *Chandler [v. United States]*, 218 F.3d [1305] at 1319 [(11th Cir. 2000)]. As we have explained:
>
> > > The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at

9

> trial. . . . We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.
>
> *Waters [v. Thomas]*, 46 F.3d [1506] at 1512 [(11th Cir. 1995)](quoting *White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992)). Accordingly, "[t]he relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Putman [v. Head]*, 268 F.3d [1223] at 1244 [(11th Cir. 2001)](quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 481, 120 S.Ct. 1029, 1037, 145 L.Ed.2d 985 (2000). This recognizes that "[t]o uphold a lawyer's strategy, a court 'need not attempt to divine the lawyer's mental processes underlying the strategy,'" but instead must simply determine whether the course actually taken by counsel might have been reasonable. *Id.* (quoting *Chandler*, 218 F.3d at 1315 n. 16).

*Crawford*, 311 F.3d at 1314.

"[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "There is a strong presumption that trial counsel's conduct is the result of trial strategy and 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *Sinclair v. Wainwright*, 814 F.2d 1516, 1519 (11th Cir. 1987), *(quoting Strickland*, 466 U.S. at 690). "Counsel's competence . . . is presumed and the defendant [petitioner] must rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (internal citation omitted). The respondent never acquires the burden of showing competence, rather the petitioner must disprove the presumption of competence. *Chandler v. United States,* 218 F.3d 1305, 1315 (11th Cir. 2000), *cert. denied,* 531 U.S. 1204 (2001). Even where an attorney's strategy may appear to be wrong in

retrospect, a finding of constitutionally ineffective representation is not automatically mandated. *Baty v. Balkcom*, 661 F.2d 391, 395 n. 8 (Former 5th Cir. 1981), *cert. denied,* 456 U.S. 1011 (1982). Whether conduct by counsel was a tactical decision is a question of fact. *Collier v. Turpin*, 177 F.3d 1184, 1199 (11th Cir. 1999). "Whether the tactic was reasonable, however, is a question of law. . . ." *Id.* Counsel's challenged conduct is viewed from counsel's perspective at the time of the conduct. *Strickland*, 466 U.S. at 689; *Collier*, 177 F.3d at 1200. It is critical to understand that the petitioner bears the burden of proof in the § 2254 action. In the absence of evidence to the contrary, this court may assume that counsel's decision was strategic. *Birt v. Montgomery*, 725 F.2d 587, 600 (11th Cir. 1984), *cert. denied,* 469 U.S. 874 (1984). After the Alabama Court of Criminal appeals remanded the matter for an evidentiary hearing on the issue of ineffective assistance of counsel, Dill failed to call as witnesses or present affidavits by either of his trial lawyers. Where, as here, petitioner forgoes the opportunity to present evidence that a given decision by counsel was constitutionally unreasonable, the court may in harmony with the mandate of *Strickland v. Washington*, view the record as a whole in order to ensure that the integrity of the adversarial testing process was preserved during the petitioner's trial.

In reviewing the prejudice prong, the United States Supreme Court in *Strickland* stated:

> It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding. . . .

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

11

In making the determination whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law. An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, "nullification," and the like. A defendant has no entitlement to the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed. The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision. It should not depend on the idiosyncracies of the particular decisionmaker, such as unusual propensities toward harshness or leniency. Although these factors may actually have entered into counsel's selection of strategies and, to that limited extent, may thus affect the performance inquiry, they are irrelevant to the prejudice inquiry. Thus, evidence about the actual process of decision, if not part of the record of the proceeding under review, and evidence about, for example, a particular judge's sentencing practices, should not be considered in the prejudice determination.

The governing legal standard plays a critical role in defining the question to be asked in assessing the prejudice from counsel's errors. When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.

*Strickland*, 466 U.S. at 693-95.

A.1    Ineffective assistance of trial counsel based on trial counsel's failure to investigate and present mitigating evidence during the penalty phase of the trial.  (See ¶ ¶ 32-67 of amended habeas petition.)

This claim of ineffective assistance of trial counsel was raised in the Rule 32 petition and on appeal. At the Rule 32 hearing, Rule 32 counsel, without producing or proffering testimony of trial

counsel, argued that counsel's failure to contact witnesses and present any mitigating evidence at the penalty phase was *prima facie* ineffective assistance of counsel. (Record on Appeal on Remand, Tr. 14-15). At sentencing, before the same jury that convicted Dill only an hour before, rejecting his claim that he had not committed the murder, Dill's trial counsel argued that:

> MR. WILKINSON: You'll be happy to know, it's no longer rank. It's not a matter of macho, and it's not a matter of math. I think the Judge will tell you ladies and gentlemen that anything can be a mitigating circumstance. The aggravating circumstances are set out as a matter of law. Anything can be a mitigating circumstance. And you now know something you did not know, a little bit about Jimmy Dill's personal biography. He is a 29-year old, had worked, done some good in the community, has a young child, wife, that sort of thing. The details of the alleged offense you already know about. But as I say, anything can be a mitigating factor. One mitigating factor outweighs 15 aggravating circumstances. Or perhaps 15 mitigating circumstances would not outweigh one aggravating factor. I think the Judge will tell you it's not a matter of being rough or tough or being macho, it's a matter of fitting the crime as you see it.
>
> I think in this instance that capital punishment would be specifically inappropriate. Thank you.

(Tr.858-60).

On remand, the Rule 32 court held:

> The Court having considered the affidavits of possible witnesses at the defendant's sentencing hearing, the Court finds that all but one of these witnesses are family members of the defendant who would have testified that defendant was a good person until he began to use drugs. This Court finds that defense counsel would not be deficient for [not] calling such witnesses and that if considered deficient would not have prejudiced the defendant.

(Record on Appeal on Remand, p. 30).

On return to remand from the denial of the Rule 32 petition, the Alabama Court of Criminal Appeals

addressed this issue as follows:

> Dill initially contends that his trial counsel rendered ineffective assistance during the sentencing phase of his trial because, he says, his counsel failed to investigate mitigating evidence, and, therefore, failed to present any mitigating evidence. Specifically, he maintains that members of his family and his friends could have provided testimony about his background that would have been useful as mitigation. At Dill's trial the only evidence presented by the defense during the sentencing phase was Dill's testimony in his own behalf.
>
> While counsel has a duty to attempt to locate evidence favorable to the defendant, "this duty only requires a *reasonable* investigation." *Singleton v. Thigpen*, 847 F.2d 668, 669 (11th Cir. 1988), *cert. denied,* 488 U.S.1019, 109 S.Ct. 822, 102 L.Ed.2d 812 (1989) (emphasis added). See *Strickland v. Washington*, 466 U.S. 668, 691, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984); *Morrison v. State*, 551 So. 2d 435 (Ala. Cr. App. 1989), *cert. denied,* 495 U.S. 911, 110 S.Ct. 1938, 109 L.Ed.2d 301 (1990). Counsel's obligation is to conduct a "substantial investigation into each of the *plausible* lines of defense." *Strickland*, 466 U.S. at 681, 104 S.Ct. at 2061 (emphasis added). "A substantial investigation is just what the term implies; it does not demand that counsel discover every shred of evidence but that a reasonable inquiry into all plausible defenses be made." *Id.*, 466 U.S. at 686, 104 S.Ct. at 2063. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." *Id.*, 466 U.S. at 691, 104 S.Ct. at 2066.

14

At the evidentiary hearing, Dill's Rule 32 counsel introduced as evidence in support of this claim affidavits from Dill's brothers, Archie, Leonard, and Lee Henry; from Carolyn Dill, Dill's sister-in-law; from Angela Whaley, the mother of Dill's child; and from Abbie Dill, Dill's aunt. These individuals indicated in their affidavits that they would have testified on Dill's behalf during the sentencing phase of his trial if they had been called as witnesses. In the affidavits, the witnesses testified about Dill's family life and history and about the kind of person Dill was before he began using drugs.

There is nothing in the record to suggest that Dill's trial counsel ignored matters that should reasonably have alerted him to the value of contacting persons who might have information about Dill's background that might be presented as mitigation evidence. See *Cochran v. State*, 548 So. 2d 1062 (Ala. Cr. App.), *cert. denied,* 493 U.S. 900, 110 S.Ct. 259, 107 L.Ed.2d 208 (1989). There is nothing in the record to indicate that Dill's counsel was aware, or should have been aware, that such persons were willing to testify on Dill's behalf at Dill's sentencing hearing. Thus, we find that Dill has not shown that his trial counsel failed to conduct a reasonable investigation to locate witnesses who could have presented mitigating evidence on his behalf. Dill has not proven by a preponderance of the evidence that his attorneys were ineffective because they failed to investigate and present possible mitigating evidence. *Fortenberry*, 659 So. 2d at 200.

Moreover, even if Dill's trial counsel had been aware of these possible witnesses, none of the testimony presented in their affidavits indicated the existence of any mitigating circumstances recognized by § 13A-5-51, Ala. Code 1975. With reference to the alleged value of the testimony of these potential witnesses, the trial judge who heard Dill's Rule 32 claims, who, as stated earlier, also presided over Dill's trial, found as follows:

> "The court having considered the affidavits of possible witnesses at the defendant's

sentencing hearing, the Court finds that all but one of these witnesses are family members of the defendant who would have testified that defendant was a good person until he began to use drugs. This Court finds that defense counsel would not be deficient for [not] calling such witnesses and that if considered deficient would not have prejudiced the defendant."

(C. 30).

We have reviewed the affidavits. We agree with the trial court that the testimony of these potential witnesses would not have changed the balance of mitigating and aggravating circumstances in Dill's case. "In a challenge to the imposition of a death sentence, the prejudice prong of the *Strickland* inquiry focuses on whether 'the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Stevens v. Zant*, 968 F.2d 1076, 1081 (11th Cir. 1992), *cert. denied*, 507 U.S. 929, 113 S.Ct. 1306, 122 L.Ed.2d 695 (1993), quoted in *Daniels v. State*, 650 So. 2d 544, 568 (Ala. Cr. App. 1994). Dill has not established the reasonable probability that, but for counsel's failure to call these witnesses during the sentencing phase of his trial, the outcome of the sentencing proceeding would have been different. In light of the evidence presented by the state at trial, we find that the actions of counsel, in presenting mitigating evidence from only Dill, were reasonable under the circumstances. *Patrick v. State*, 680 So. 2d 959, 962 (Ala. Cr. App. 1996) (holding that trial counsel is not required to investigate every "will-o'-the-wisp or rabbit trail matters of mitigation or defense"). See *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) ("our decisions teach that whether counsel's performance is constitutionally deficient depends upon the totality of the circumstances viewed through a lens shaped by the rules and presumptions set down in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and its progeny"); and *Singleton, supra* (no showing of prejudice resulting from inadequate investigation by

> trial counsel where habeas petition failed to proffer the type of mitigating evidence that would have changed outcome of trial had trial counsel conducted further investigation). Because Dill has not shown that any additional evidence would have changed the trial court's decision at sentencing, we agree with the trial court's ruling that trial counsel did not render ineffective assistance with regard to the investigation and presentation of mitigating evidence during the sentencing phase of Dill's trial. *Davis v. State*, 720 So. 2d 1006 (Ala. Cr. App. 1998).

767 So. 2d at 371-72.

The principles of *Strickland v. Washington* govern the analysis of petitioner's claim that trial counsel failed to investigate and present mitigating evidence during the penalty phase of the trial.[6] The United States Supreme Court has repeatedly held that *Strickland* sets forth the governing principles in ineffective assistance of counsel claims related to claims involving the investigation and presentation of mitigating circumstances at sentencing. See *Bell v. Cone*, 535 U.S. 685 (2002); *Williams v. Taylor*, 529 U.S. 362 (2000); *Burger v. Kemp*, 483 U.S. 776 (1987); *Darden v. Wainwright*, 477 U.S. 168 (1986). In all of these Supreme Court cases, including *Strickland*, the court had the benefit of trial counsel's testimony in the state collateral proceedings.

The state court correctly identified the principles of *Strickland* as controlling respondent's claim. The state court's adjudication was not contrary to clearly established federal law as determined by the Supreme Court of the United States.

An attorney has no absolute duty to introduce mitigating or character evidence, *Chandler* 218 F.3d at 1319; however, the failure of counsel to conduct a reasonable investigation, including an

---

[6] Although the principles in *Strickland v. Washington* govern all ineffective assistance of counsel claims, the court notes that the specific instance of ineffective assistance of counsel complained of in *Strickland* was based on trial counsel's efforts to investigate and to present mitigating circumstances at sentencing.

17

investigation of the defendant's background, for possible mitigating evidence may render counsel's

assistance ineffective. *Baxter v. Thomas* 45 F.3d 1501, 1513 (11th Cir. 1995), *cert. denied,* 516 U.S.

946 (1995).

> When determining whether defense counsel
> conducted a reasonable investigation, our inquiry is
> three-fold. First, "it must be determined whether a
> reasonable investigation should have uncovered the
> mitigating evidence. If so, then a determination must
> be made whether the failure to put this evidence
> before the jury was a tactical choice by trial counsel."
> ... If the decision was tactical, that decision is
> afforded a "strong presumption of correctness." ... If,
> however, the decision was not tactical, we must then
> determine whether "there is a reasonable probability
> that absent the errors, the sentencer .. would have
> concluded that the balance of the aggravating and
> mitigating circumstances did not warrant death.

*Baxter v. Thomas,* 45 F.3d 1501, 1514 (11th Cir. 1995) (citations omitted).

In virtually every case in which a claim of ineffective assistance of counsel is asserted a

petitioner will call his trial counsel to testify as to the investigation and his reason for his course of

conduct. When the court is informed of the basis for counsel's conduct, the court can then determine

whether the decision was tactical and then whether it was reasonable. When the petitioner denies

the court of the information related to the basis for counsel's conduct, only rank speculation can be

employed in attempting to assess whether the conduct was tactical. *Strickland* requires the court

to presume the conduct was based on strategy. Dill denied the trial court of any evidence upon

which to analyze the decision making process.

Petitioner argues that the state court decisions were based on an unreasonable determination

of the facts in light of the evidence presented in the Rule 32 hearing. At the Rule 32 hearing,

counsel for petitioner presented the affidavits of Abbie Dill, Angela Johnson Whaley, Archie Dill,

18

Caroline Elaine Dill, Leonard Dill, and Lee Henry Dill. (See record on appeal on remand, pp. 17-22 and TR-9). As previously stated, petitioner was not present at the Rule 32 hearing apparently because Rule 32 counsel was not aware that it was his responsibility to request that petitioner be present.[7] Rule 32 counsel did not call either of petitioner's trial lawyers or any of the affiants to testify at the Rule 32 hearing. Further, Rule 32 counsel did not introduce an affidavit from either of petitioner's trial lawyers. There is no indication from the Rule 32 record that Dill would have testified had he been present. Indeed there is evidence that the parties had agreed to proceed by stipulation and or affidavits. (Record on Appeal on Remand, TR-4).

A review of the affidavits submitted indicates that the appellate court's summary of their contents was accurate. While it is true that two of the affiants, Abbie Dill and Angela Johnson Whaley, also testified by affidavit that "no one contacted me or asked for my testimony," this court cannot conclude based on the evidence that was before the Rule 32 court that the state court decisions were based on an unreasonable determination of the facts in light of the evidence presented in the Rule 32 hearing. The Alabama Court of Criminal Appeals held that Dill failed to establish that his attorneys were ineffective because there was nothing in the record to suggest that Dill's trial

---

[7]    The record reflects the following:

    THE COURT:    All right. This is a Rule 32 hearing in the case of Jimmy Lee Dill. Mr. Bevers, are you here on behalf of Mr. Dill?

    MR. BEVERS:    Yes, Your Honor. I'm Michael Bevers on behalf of Mr. Dill assisting in this case. For the record we would move to object that Mr. Dill was not brought here to the courtroom and he's not present.

    THE COURT:    Where is he?

    MR. BEVERS:    He's in prison in West Jefferson.

    THE COURT:    There was no request that he be here, otherwise I would have had him here.

    MR. BEVERS:    Would that have been our duty to request that, Your Honor?

    THE COURT:    Yes, sir.

    MR. BEVERS:    Very well ....

    (R-35, p. 2).

Rule 32 counsel did not preserve his objection to Mr. Dill's absence from the hearing. Counsel also neither asked for a continuance in order to have Dill present nor requested permission to supplement the Rule 32 record with an affidavit from Dill.

counsel ignored matters that should have alerted him to the value of contacting persons who might have information about Dill's background that might be presented as mitigation evidence or that counsel should have been aware that the persons were willing to testify on Dill's behalf at the sentencing hearing.[8]

Dill argues that the state court decisions involved an unreasonable application of the law as set out by the Supreme Court.  In *Williams v. Taylor*, 529 U.S. 362, 407-11 (2000), the United States Supreme Court explained:

> A state court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case certainly would qualify as a decision "involv[ing] an unreasonable application of ... clearly established Federal law."
>
> ....
>
> [A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable .
>
> ....
>
> Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.

---

[8]    Had Dill testified at the September 13, 1996 Rule 32 hearing precisely as he asserted in his January 8, 2002 affidavit, (doc. #20), the Alabama Court of Criminal Appeals' determination of the facts in light of the evidence presented in the Rule 32 hearing would have nonetheless been reasonable as Dill's affidavit as to what he might have told trial counsel is extremely vague and conclusory.  It is not clear from Dill's affidavit which witnesses he discussed with counsel nor what he thought their testimony would be.  We have no evidence from counsel as to what he knew or was told by Dill.

Dill argues that there is at least "grave doubt" that the Alabama court applied *Lockett v. Ohio*, 438 U.S. 586 (1978) in analyzing the prejudice component of *Strickland*. (See doc. #20, pp. 3-6). This argument is apparently predicated upon the Alabama Court of Criminal Appeals' determination that none of the testimony presented in the affidavits indicated the existence of any statutory mitigating circumstances. While the court did not specifically refer to nonstatutory mitigating circumstances, it is clear that the appellate court did in fact consider whether the testimony of the potential witnesses would have constituted nonstatutory mitigating evidence when discussing whether the testimony would have changed the balance of mitigating and aggravating circumstances in Dill's case and concluded that it would not. In order to demonstrate prejudice arising from ineffective assistance of counsel at sentencing resulting in a death sentence, it is the petitioner's burden to show a reasonable probability that the testimony of the potential witnesses would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and hence the sentence imposed. *Strickland*, 466 U.S. at 700. It is unlikely that the testimony of the potential witnesses concerning the nonstatutory mitigating evidence that Dill was a good person until he became involved in drugs would have outweighed the three statutory aggravating circumstances[9] present in this case.

The state court decisions were neither based on an unreasonable application of the law nor an unreasonable determination of the facts in light of the evidence presented in the Rule 32 hearing. Dill is therefore not entitled to habeas relief on this claim of ineffective assistance of counsel.

---

[9] The applicable aggravating circumstances in this case are that the capital offense was committed by Dill while under sentence of imprisonment (on parole), Dill was previously convicted of a felony involving the use or threat of violence to the person (robbery II), and the capital offense was committed while Dill was engaged in a robbery.

Dill has filed a motion for hearing (doc # 20) and argues that he is entitled to an evidentiary hearing in federal court on his claim that counsel was ineffective at sentencing for failing to present mitigating evidence. 28 U.S.C. § 2254(e)(2) provides:

> (2)    If the applicant has failed to develop the factual basis for a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant show that –
>
> (A)    the claim relies on –
>
> > (i)    a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable or
> >
> > (ii)    a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B)    the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Dill argues that he falls within the provision of § 2254(e)(2)(A)(ii) because it was the state's fault that he was not able to develop the record in state court. Specifically, petitioner alleges:

> In the instant case Petitioner was confined to State custody under the sentence of death and the State controlled whether or not he could be present for his Rule 32 hearing. The record further indicates that counsel expected him to be present and objected to his absence (Page 2, 9/23/96 proceeding). That counsel acquiesced in the judge's ruling that counsel bore the responsibility to ask for his client's presence at an earlier point, does not alter the fact that state action resulted in the absence of Jimmy Dill and his inability to advise and consult with his attorneys, and/or to be called as a witness during the Rule 32 hearing and present testimony.

(Doc. # 20, paragraph 26).

In *Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992), the United States Supreme Court held that where a petitioner fails to develop the facts in support of his habeas claim in a state collateral evidentiary hearing the petitioner is entitled to a federal evidentiary hearing only if he can show both cause for his failure to develop the facts in the state court proceedings and actual prejudice resulting from that failure or if he can demonstrate that a fundamental miscarriage of justice would result from failure to hold a federal evidentiary hearing. In *Williams v. Taylor*, 529 U.S. 420 (2000), the court observed that § 2254(e)(2) as amended by the Anti-Terrorism and Effective Death Penalty Act (herein AEDPA) "raised the bar *Keeney* imposed on prisoners who were not diligent in state-court proceedings... so that prisoners who would have had to satisfy *Keeney's* test for excusing the deficiency in the state-court record prior to the AEDPA are now controlled by § 2254(e)(2)." 529 U.S. at 433-34.

The *Williams* court recognized that before § 2254(e)(2) is even called into play, there must first be a determination of diligence:

> The question is not whether the facts could have been discovered but instead whether the prisoner was diligent in his efforts. The purpose of the fault component of "failed" is to ensure the prisoner undertakes his own diligent search for evidence. Diligence for purposes of the opening clause depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court ...Though lack of diligence will not bar an evidentiary hearing if efforts to discover the facts would have been in vain, see § 2254(e)(2)(A)(ii), and there is a convincing claim of innocence, see § 2254 (e)(2)(B), only a prisoner who has neglected his rights in state court need satisfy these conditions.
>
> ....
>
> Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing

23

> in state court in the manner prescribed by state law.
> ... For state courts to have their rightful opportunity to
> adjudicate federal rights, the prisoner must be diligent
> in developing the record and presenting, if possible,
> all claims of constitutional error. If the prisoner fails
> to do so, himself or herself contributing to the absence
> of a full and fair adjudication in state court, §
> 2254(e)(2) prohibits an evidentiary hearing to develop
> the relevant claims in federal court unless the statute's
> other stringent requirements are met. Federal courts
> sitting in habeas are not an alternative forum for
> trying facts and issues which a prisoner made
> insufficient effort to pursue in state proceedings. Yet
> comity is not served by saying a prisoner "has failed
> to develop the factual basis of a claim" where he was
> unable to develop his claim in state court despite
> diligent effort. In that circumstance, an evidentiary
> hearing is not barred by § 2254(e)(2).

*Williams*, 529 U.S. at 435-37.

By relying on § 2254(e)(2)(A)(ii) as the basis for his entitlement to a federal evidentiary hearing,

Dill in effect necessarily concedes that he did not exercise due diligence in developing the state court

record; therefore, he must satisfy both § 2254(e)(2)(A)(ii) and § 2254(e)(2)(B). Despite the apparent

concession, the court will nevertheless look at whether Dill exercised due diligence in developing

the state court record. Although Dill was not present at the evidentiary hearing apparently because

counsel did not properly request his presence in advance, counsel did not request a continuance in

order to secure Dill's presence nor did he seek to supplement the Rule 32 record with an affidavit

by Dill. In an affidavit prepared in 2002, almost six years after the Rule 32 evidentiary hearing, Dill

identifies various people who he states would have testified in his favor at sentencing. Notably,

however, he does not state that he identified the specific witnesses to trial counsel. In addition, he

states in his affidavit that he had an abusive father and long-time alcohol and drug problem and that

the victim was the drug dealer who was responsible for his drug involvement. Also of some

significance is the fact that Dill does not state it was ever intended that he testify at the Rule 32 hearing.[10]

Dill's 2002 affidavit does not unequivocally state that he would have testified at the Rule 32 hearing had he been called. Most importantly, however, Dill has offered no reason for the decision not to present the live or affidavit testimony of either of his trial attorneys at the Rule 32 hearing. A claim of ineffective assistance of counsel involves an inquiry into the actions of and reasoning by counsel. While Dill's allegations in the Rule 32 petition stated the basis for a claim of ineffective assistance of counsel, counsel's testimony was crucial to determining the validity of such a claim. Had trial counsel been present to testify at the Rule 32 hearing, Dill's testimony may have rebutted the testimony of trial counsel. Based on Dill's failure to present testimony by trial counsel at the evidentiary hearing, the court concludes that Dill did not exercise due diligence in developing the state court record; therefore, he must satisfy both § 2254(e)(2)(ii) and § 2254(e)(2)(B).

---

[10] As noted above it appears from the Record on Appeal on Remand that neither of the parties would call witnesses but rather intended for the court to take evidence by affidavits. At the Rule 32 hearing, counsel for the state stated "[T]he Court is aware it certainly has the discretion under Rule 32.9(a) to receive in evidence by affidavits in lieu of an evidentiary hearing I believe is what we had done in this case." (Record on Appeal on Remand, TR. 4). Further, counsel for Dill called no witnesses and did not suggest that Dill was to be called to testify but merely referred to the affidavits that had been submitted to the court. (Record on Appeal on Remand, Tr. 9).

The court does not interpret the pleadings before the court to include an allegation that Dill was deprived of a constitutional right to be present at the Rule 32 hearing. Moreover, such a claim would necessarily fail. Due process guarantees a defendant the right to be present during any proceeding where his presence has a reasonably substantial relationship to his ability to conduct his defense. *United States v. Gagnon*, 470 U.S. 522 (1985). The constitutional right to be present is rooted to a large extent in the confrontation clause of the Sixth Amendment. *Id.* The presence of a defendant is a condition of due process only to the extent that a fair and just hearing would be thwarted by his absence. *Snyder v. Com. of Massachusetts*, 291 U.S. 97 (1934).

In the instant case, the Rule 32 hearing was beyond the defense stage. There was no testimony presented by either side; therefore, Dill's right to confrontation was not implicated. Since the argument at the Rule 32 hearing was purely legal argument conducted by counsel, the court does not see how Dill's absence would affect the fairness of the hearing.

The conduct of Dill's Rule 32 counsel is attributable to Dill in determining whether he exercised due diligence in developing the state court record. *Hall v. Head*, 310 F.3d 683, 689 (11th Cir. 2002), *cert denied*, ____ U.S. ____, 124 S.Ct. 329, 157 L.Ed.2d 225 (2003). Dill's claim of ineffective assistance of trial counsel was based on evidence that existed at the time of the state hearing, and any lack of evidence stems from Dill's failure to diligently develop it through the testimony of trial counsel and by requesting an opportunity to submit further testimony by Dill either live or by affidavit; therefore, Dill has failed to show "a factual predicate that could not have been previously discovered through the exercise of due diligence." 2254(e)(2)(ii). Finally, Dill has failed to satisfy the burden of § 2254(e)(2)(B) because he has not shown "the facts underlying the claim [of ineffective assistance of counsel] would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found [him] guilty of the underlying offense [capital murder]." See also, *Hall*, 310 F.3d at 689. Dill is not entitled to a federal evidentiary hearing.

This court should not consider Dill's 2002 affidavit which was attached to his motion for evidentiary hearing in that this court's review of the action of the state court is guided by 28 U.S.C. § 2254(d). However, even if the 2002 affidavit had been part of the Rule 32 record and could be properly considered here, that affidavit would not have been sufficient to establish that trial counsel's performance was deficient.[11]

---

[11]/ The provisions of 2254 as amended in 1996 which are applicable to this petition compel this conclusion. Congress has expressly limited the scope of review. Had this petition been filed prior to 1996 and perhaps before *Keeney v. Tamayo-Reyes* this court might well have considered an evidentiary proceeding because of the limited mitigation evidence which was actually offered. A further inquiry into the choices made by trial counsel may have been prudent. Under the current law the state court determination is entitled to a new deference and it cannot be said as a matter of law that the application of law or determination of facts was unreasonable. That does not mean that this court would necessarily reach the same conclusion if writing on a blank slate.

A.3.   Ineffective assistance of trial counsel based on trial
counsel's failure to investigate the cause of the victim's
death. (See ¶¶ 77-100 of amended habeas petition.)

This issue was raised in the Rule 32 petition and on appeal from the denial thereof.  On

remand the Rule 32 court addressed this issue as follows:

> Dr. Shugerman was one of the physicians who treated
> the victim.  Although he was not called as a witness,
> all of his records of treatment were admitted through
> Dr. Langford who also treated the victim.  (State's
> Exhibit No. 4).
>
> It is clear from the evidence and testimony of Dr.
> Brissie and Dr. Langford that the cause of death was
> a gunshot [wound] to the head.
>
> Dr. Shugerman's testimony would not have changed
> or altered that conclusion.
>
> Defense counsel was not deficient in his performance
> by not calling Dr. Shugerman nor did his failure to
> call him prejudice the defendant.

(Record on Appeal on Remand, p. 30).

On return to remand from the denial of the Rule 32 petition, the Alabama Court of Criminal

Appeals addressed this issue as follows:

> Dill contends that his trial counsel rendered
> ineffective assistance because counsel failed to
> present evidence supporting an intervening cause of
> death.  Specifically, Dill maintains that testimony
> from Dr. Alwyn A. Shugerman, the physician who
> treated the victim just before his death, would
> establish that the victim did not die as a result of a
> gunshot wound, but as the result of dehydration.  In
> support of his argument Dill admitted into evidence
> an affidavit from Dr. Shugerman, in which Dr.
> Shugerman states that Shaw's immediate cause of
> death was "severe metabolic derangement and

27

multiple organ failure associated with severe dehydration."

(C. 23).

Dill raised the substantive grounds of this claim for relief on direct appeal. This court, however, rejected this claim, holding:

> "The appellant contends that there is insufficient evidence to sustain the verdict because Leon Shaw's death was caused by his pulling out his feeding tube and dehydration rather than a gunshot wound. We disagree. The record reveals that two physicians testified that the victim died as a result of complications from a gunshot wound. There was testimony that the victim was admitted to the hospital with an injury that was 'generally not survivable.'

> (R. 305).

> "'A person is criminally liable if the result would not have occurred but for his conduct, operating alone or concurrently, with another cause, unless the concurrent cause was sufficient to produce the result and the conduct of the actor clearly insufficient.' Ala. Code 1975 § 13A-2-5-(a).

> "'Where as here, the wound inflicted by defendant upon the victim is dangerous to life, the fact that there are other contributing causes of death does not prevent such a wound from being the legal cause of death. It does not have to be the sole cause. This is true whether (1) the other causes preceded, (2) the other cause is synchronous with, or (3) the other cause follows, commission of the felonious act charged.' (citations omitted).

> *"Smith v. State*, 354 So. 2d 1167, 1170 (Ala. Cr. App. 1977), *cert. denied,* 354 So. 2d 1172 (Ala. 1978). *We see no reasonable basis for*

> *a conclusion that the death was not caused by the gunshot wound.* The evidence clearly supports the verdict."

*Dill*, 600 So. 2d at 359 (emphasis added).

Because this court rejected the substantive argument underlying Dill's claim, Dill has failed to support his claim that trial counsel was ineffective for not presenting the testimony of Dr. Shugerman at trial. Moreover, the trial court found as follows with regard to this claim:

> "Dr. Shugerman was one of the physicians who treated the victim. Although he was not called as a witness, all of his records of treatment were admitted through Dr. Langford, who also treated the victim. (State's Exhibit No. 4)

> "It is clear from the evidence and testimony of Dr. Brissie and Dr. Langford that the cause of death was a gunshot to the head.

> "Dr. Shugerman's testimony would not have changed or altered that conclusion.

> "Defense counsel was not deficient in his performance by not calling Dr. Shugerman nor did his failure to call him prejudice the defendant."

(C. 30).

We have reviewed the record of Dill's direct appeal; we agree with the trial court that Dr. Shugerman's testimony would, at best, be cumulative of other evidence already admitted. The testimony that Dill says Dr. Shugerman would give substantially mirrors the testimony presented at trial by Dr. Langford and Dr. Brissie. Therefore, Dill has failed to establish that he was prejudiced by counsel's failure to call Dr. Shugerman and that there was a reasonable probability that, but for this failure to elicit testimony from Dr. Shugerman about the intervening cause of

> death, the outcome of his trial could have been different.
>
> Finally, in light of the evidence as presented at trial, Dill's trial counsel may well have made a strategic decision not to focus on the immediate cause of the victim's death. A review of the totality of the circumstances surrounding the victim's death indicates that because of the shotgun wound, the victim's quality of life gradually diminished to the point that the victim, who had a wife and children, was no longer a productive member of society. Counsel may have believed this testimony would have generated more sympathy for the victim. "Strategic choices made after thorough investigation of relevant law and facts are virtually unchallengeable." *Ex parte Lawley*, 512 So. 2d 1370, 1372 (Ala. 1987). We will refrain from using hindsight to evaluate trial counsel's decisions. See *Hallford*, 629 So. 2d at 9; and *State v. Tarver*, 629 So. 2d 14, 21 (Ala. Cr. App. 1993). See also *Cade v. State*, 629 So. 2d 38, 42 (Ala. Cr. App. 1993) *cert. denied*, 511 U.S. 1046, 114 S.Ct. 1579, 128 L.Ed.2d 221 (1994) (holding that "an attorney may reasonably decide to avoid presenting evidence [or a defense] that he believes will do more harm than good"). Considering the evidence in its entirety, we cannot say that the failure of Dill's counsel to call Dr. Shugerman as a witness at trial was unreasonable. Nor can we say that there is a reasonable probability that, but for counsel's actions, the results of the proceedings would have been different. We agree with the trial court's ruling that Dill's counsel did not render ineffective assistance in this regard.

767 So. 2d at 372-74.

Dill complains that the Alabama Court of Criminal Appeals did not address the contents of the affidavits of the individuals who saw that the victim was improving along with records that show the same. The affiants were Terry Dill, petitioner's nephew, and Abbie Dill, petitioner's sister-in-law. Terry and Abbie Dill testified that when they visited the victim after his release from the hospital, it appeared his health was improving because he could communicate by blinking once for

no and twice for yes. The victim could also identify both Terry and Abbie Dill. (Rule 32 record, pp. 64-66, 68-70). Terry further speculated in his affidavit that the victim's wife may have removed the victim's feeding tube, not given him food or water and left him to die.

Dr. Brissie, the coroner, testified that he believed the victim died of "complications from a gunshot wound to the head" (TR-329). When asked to elaborate on the complications, he testified:

> A:   At the time the deceased was hospitalized for the second time he reportedly had pulled a gastrostomy tube out that had been sewn in place at the time of the first hospitalization. There allegedly according to the chart had been some indication that he was able to swallow or somehow be fed to a certain degree. There was a history that he had experienced apparent fever, and that he appeared to be quite ill and was taken to the hospital, at which time they did some ceremelectrolyte levels that showed a very high sodium level of 169 (inaudible) per liter, and a low potassium level in his blood of 2.1 (inaudible) per liter. And he appeared to be very dehydrated. Shortly thereafter he was–while in the emergency room he had a cardiorespiratory arrest, and he had to be resuscitated, and he was transported to the Cardiac Care Unit. And he had two cardiorespiratory arrests while there. He was in shock. He required two pressure agents to help bring the blood pressure up during the course of this hospitalization. He subsequently developed a complication of shock which is called the shock lung syndrome. And those things – And while in the hospital also according to notations on the record he allegedly had had seizure activity that further complicated his problems. And he died as a result of that group of complications related to his gunshot wound.

(TR-329).

Dill argues in the reply brief that only one doctor opined that the gunshot wound was the immediate cause of death. This contention is factually incorrect. Dr. Keith Langford, the victim's neurosurgeon, also testified that the victim died of "complications of a gunshot wound to the head":

> Q:   All, right. Did you come to a conclusion as to the cause of death of Leon Shaw, or how do you come to an opinion as to his cause of death?

> A:   Taking into account the discharge summary which I have in front of me, and my knowledge of the patient when he was under my care, he died from the complications of a gunshot wound to the head.

31

> Q:     And what exactly, Doctor, were those complications he was treated for and
>         later died as a result of when he was admitted on October 31st, 1988?
>
> A:     The patient was admitted in a state of extreme and precarious cardiovascular
>        (inaudible) poverty of activities and that say [sic] that at the time he was
>        admitted to the hospital he actually had a respiratory arrest, that is, he
>        stopped breathing, and had to have a tube put into his breathing tube or his
>        windpipe. And at the same time he had a severe interference with his heart
>        function with a drop in blood pressure. And he was given medicines and
>        emergency treatment to control that situation also. And the patient was found
>        to have a sever dehydration along with the profound loss of blood pressure
>        and along with the respiratory failure.

(TR-294-95).

Dr. Michael W. Gorham, another of the victim's neurosurgeons, also testified at trial. His

questioning did not include questions related to the cause of death. He did testify that the victim's

injury "is an injury that's generally not survivable." (TR-305).

In an affidavit dated June 14, 1994, Dr. Alwyn A. Shugerman, the victim's treating physician

when admitted just prior to his death, testified:

> Because of Shaw's medical condition preceding this
> death, it would have been proper to say that severe
> dehydration, along with the other related
> derangements, was a primary cause of Shaw's death.

In an affidavit dated July 13, 1996 (See tab R-38), Dr. Shugerman testified:

> In the emergency room he had generalized seizures
> and respiratory arrest requiring emergency intubation.
> After admission he exhibited repeated
> cardiopulmonary arrest, severe hypotension, anuria
> and other evidence of severe metabolic derangement.
> To the best of my knowledge no other history was
> available at that time. ... .The data reviewed suggests
> that the immediate cause of death was severe
> metabolic derangement and multiple organ failure
> associated with severe dehydration.

Dr. Shugerman's testimony that severe dehydration was the primary or immediate cause of the victim's death is not inconsistent with the conclusions of Drs. Brissie and Langford that the victim died of "complications from a gunshot wound to the head." Whether the immediate cause of death was the gunshot wound or complications from the gunshot wound, under Alabama law, Dill would be criminally liable if the death was related to the gunshot wound.

Dill argues that Dr. Shugerman's opinion, combined with information from Abbie and Terry Dill [12] regarding the victim's improvement and the motives of his wife to assist the victim to die by denying him care, would have provided a defense to the charge of murder and not been cumulative. To the extent that Dill argues that counsel could have tried to defend him by trying to shift the blame for the victim's death to the victim's wife, such a defense would have placed counsel in an extremely awkward position since Dill's defense was that he did not shoot the victim. Counsel would have been in the position of arguing that Dill did not shoot the victim but even if he did shoot the victim someone else was actually responsible for the victim's death. While it is *conceivably* possible, it is not *reasonably* probable that the result of the trial would have been different if Dr. Shugerman's opinion and Terry Dill's suspicion had been presented to the jury concerning an intervening cause of death.

The state court's adjudication that petitioner was not deprived of effective assistance of counsel by trial counsel's failure to call Dr. Shugerman to testify about the cause of the victim's

---

[12]/ The court notes that both Terry and Abbie Dill testified for the state at petitioner's trial. Terry Dill testified that petitioner was angry with the victim because the victim would not give him cocaine, that petitioner indicated that he was thinking of shooting and robbing the victim, that petitioner actually did shoot and rob the victim and that petitioner acted as though he was going to shoot the victim again. (TR. 488-508) Abbie Dill testified that before petitioner was arrested he told her "you don't worry about what done happened, you get us some money up and send us out of town." (TR.444-45). Immediately before petitioner's trial began, he called Abbie Dill and said that "he [was] afraid and give all his dirty deeds or whatever he have done to the Lord, and nobody should punish him for what he has done." He also told her "Terry should go on and not say anything and take some years or ... whatever they going to give him." (TR. 444-46).

death did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding nor did it involve an unreasonable application of *Strickland*.

C.   Miscellaneous claims of ineffective assistance
     of counsel raised in Rule 32 petition

On remand, the Rule 32 court held:

> All other allegations of ineffective assistance of counsel have not been argued but this Court having tried this case finds that defense counsel was diligent and competent in his representation of the defendant. And he was not deficient in his performance.

With respect to the following allegations of ineffective assistance of counsel, the Alabama Court of Criminal Appeals found that Dill failed to present evidence at the Rule 32 hearing and thus failed to carry his burden of establishing deficient performance and prejudice:

A.2.   Ineffective assistance of trial counsel based on trial counsel's failure to investigate or call any defense witnesses. (See ¶¶ 68-76 of amended habeas petition.)

A.4.   Ineffective assistance of trial counsel based on trial counsel's failure to object to the prosecutor's argument that mitigating circumstances are limited to statutory mitigating circumstances. (See ¶¶ 101-02 of amended habeas petition.)

A.5.   Ineffective assistance of trial counsel based on trial counsel's failure to object to the trial court's jury instructions on aggravating and mitigating circumstances which may have given the jury the impression that it had to be unanimous in finding a mitigating circumstance. (See ¶¶ 103-06 of amended habeas petition.)

A.7.   Ineffective assistance of trial counsel based on trial counsel's failure to ask potential jurors if any of them had fixed opinions in favor of the death penalty. (See ¶¶ 110-11 of amended habeas petition.)

A.8.   Ineffective assistance of trial counsel based on trial counsel's failure to strike three jurors who displayed potential prejudice against Dill. (See ¶112 of amended habeas petition.)

34

A.9.    Ineffective assistance of trial counsel based on trial counsel's failure to object to the prosecutor's explanation for her peremptory strikes. (See ¶ 114 of amended habeas petition.)

A.10.   Ineffective assistance of trial counsel based on trial counsel's failure to object to the prosecutor's expression of a personal opinion about Dill's guilt. (See ¶ ¶ 115-16 of amended habeas petition.)

A.11.   Ineffective assistance of trial counsel based on trial counsel's failure to object when the prosecutor vouched for the credibility of state witnesses. (See ¶ ¶ 117-20 of amended habeas petition.)

A.12.   Ineffective assistance of trial counsel based on trial counsel's failure to object during the guilt and penalty phases of the trial when the prosecutor asked the jury to do its duty. (See ¶ ¶ 121-22 of amended habeas petition.)

A.13.   Ineffective assistance of trial counsel based on trial counsel's failure to object when the prosecutor commented on Dill's failure to testify. (See ¶ ¶ 123-26 of amended habeas petition.)

A.14.   Ineffective assistance of trial counsel based on trial counsel's failure to object to improper comments made by the prosecutor and a state witness regarding Dill's pre-arrest silence. (See ¶ ¶ 127-132 of amended habeas petition.)

A.15.   Ineffective assistance of trial counsel based on trial counsel's failure to object to the prosecutor's comments on Dill's right to counsel. (See ¶ ¶ 133-35 of amended habeas petition.)

A.16.   Ineffective assistance of trial counsel based on trial counsel's failure to object when the trial court equated reasonable doubt with moral certainty.  (See ¶ ¶ 136-37 of amended habeas petition.)

Specifically, on return to remand, the Alabama Court of Criminal Appeals stated:

> Dill sets forth the following claims as instances of his trial counsel's alleged failure to provide effective assistance during the guilt and sentencing phases of his trial:
>
> 1.    His counsel allegedly failed to adequately investigate an available defense during the guilt phase of his trial.
>
> 2.    His counsel allegedly failed to interview or to call as witnesses persons who could impeach the testimony of Terry Dill, Abbie Dill, and the victim's wife.

35

3.   His counsel allegedly failed to determine if Shaw had cash in his possession at the time [he] was shot.

4.   His counsel allegedly failed to listen to Dill's tape-recorded statement to the police.

5.   His counsel allegedly failed to investigate his emotional and mental health and his use of drugs at the time of the killing.

6.   His counsel allegedly failed to conduct an adequate voir dire and jury selection, in that counsel:

   a.   failed to ask prospective jurors if any of them was unalterably in favor of the death penalty;

   b.   failed to strike those prospective jurors who expressed potential bias against Dill; and

   c.   failed to object when the prosecutor struck prospective jurors on the basis of their economic status.

7.   His counsel failed to object to the following alleged instances of prosecutorial misconduct

   a.   the prosecutor's expressing her personal opinion that Dill was guilty;

   b.   the prosecutor's vouching for the credibility of state's witnesses;

   c.   the prosecutor's imploring jurors to "do their duty" in both the guilt and sentencing phases of trial;

   d.   the prosecutor's numerous comments on Dill's exercise of his right against self-incrimination; and

   e.   the prosecutor's commenting upon Dill's pre-arrest silence.

....

14.   His counsel failed to object to the prosecutor's comments on Dill's right to counsel.

....

19.   His counsel failed to object to the trial court's instruction on reasonable doubt.

36

20.     His counsel failed to object to the prosecutor's
        arguments that mitigating circumstances are limited
        to those in the Alabama Code.

21.     His counsel failed to object to the trial court's
        allegedly deficient jury instructions on aggravating
        and mitigating circumstances.

Dill presented no evidence in support of these claims in his Rule 32
hearing. Therefore, Dill has failed to establish that his trial counsel's
performance was deficient and that he was prejudiced by that
deficient performance.

. . . .

> We agree with the trial court's ruling that Dill failed
> to present any evidence in support of these allegations
> and that his counsel's performance has not been
> shown to be deficient with regard to these matters.
> As this court observed in *Stringfellow v. State*, 485
> So. 2d 1238, 1243 (Ala. Crim. App. 1986),
> "'[e]ffectiveness of counsel does not lend itself to
> measurement by picking through the transcript and
> counting the places where objections might be
> made.'"

767 So. 2d at 376.

In light of Dill's failure to present testimony by trial counsel, the court concludes that adjudication

of these claims of ineffective assistance of counsel in state court did not result in a decision contrary

to or involving an unreasonable application of United States Supreme Court law nor did it result in

a decision that was  based on an unreasonable determination of the facts in light of the evidence

presented in the state court proceeding.

B.     Prosecutorial misconduct (See ¶ ¶ 141-157 of amended habeas petition.)

        Dill contends that his right to counsel, due process and a fair trial were violated by comments

made by the prosecutor.  A petitioner is entitled to habeas relief based on the improper comments

of a prosecutor only if the comments "so infected the trial with unfairness as to make the resulting

conviction [or sentence] a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).   The Alabama appellate courts reviewed the claims for plain error and found that none of the claims rose to the level of plain error. Rule 45A, Ala. Rules of Appellate Procedure provides:

> In all cases  in  which the death penalty has been imposed, the Court of Criminal Appeals shall  notice any plain error or defect in the proceedings under review, whether  or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.

Although the state appellate court did not specifically refer to *Darden* or *Donnelly* in its opinion, Alabama appellate courts are guided by the due process standard expressed in *Donnelly* when reviewing  a prosecutor's comments for plain error. See *Bankhead v. State*, 585 So. 2d 97, 106-07 (Ala. Crim. App. 1989), *remanded on other grounds*, 585 So. 2d 112 (Ala. 1991), *affirmed on return to remand*, 625 So. 2d 1141 (Ala. Crim. App. 1992), *rev'd on other grounds*, 625 So. 2d 1146 (Ala. 1993).  See also, *Ferguson v. State*, 814 So. 2d 925 (Ala. Crim. App. 2000), *affirmed*, 814 So. 2d 970 (Ala. 2001), *cert. denied*, 535 U.S. 907 (2002).

> 1.    Prosecutorial misconduct based on the prosecutor's improper comment on Dill's right to counsel.
> (See ¶¶ 141-43 of amended habeas petition.)

Dill complains first that the prosecutor pointed out that he was writing notes and immediately thereafter his lawyer asked a question (TR. 775-76).  He notes that the prosecutor charged defense counsel with creating a smoke screen. (TR. 777).

On direct appeal, the Alabama Court of Criminal Appeals addressed the claim as follows:

> The appellant next contends that his right to counsel
> was violated by statements made by the prosecutor
> that invited the jury to punish the appellant for
> exercising his constitutional right to counsel. This
> argument has no merit. We have carefully reviewed
> the record and can find no comments made by the
> prosecutor that even impliedly referred to the
> appellant's right to counsel. The comments cited by
> the appellant were either proper replies in kind or
> proper comments on the appellant's theory of the
> case. Furthermore, the appellant failed to object to
> any of the cited comments. Even if such comments
> had been error, they certainly did not rise to the level
> of plain error. *See Ex parte Wilhite*, 485 So. 2d 787
> (Ala. 1986); *Martin v. State*, 548 So. 2d 488 (Ala.
> Crim. App. 1988), *aff'd*, 548 So. 2d 496 (Ala.), *cert.
> denied*, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383
> (1989).

600 So. 2d at 354-55.

The transcript reflects the following argument by the prosecutor:

> And I heard so many hypotheses in this case I don't
> know which one he's going under. I saw a defense
> develop in front of my very eyes. We hear the name,
> Marvin, for the first time. And we see Jimmy writing
> notes over here, and all of a sudden we hear the
> question, well wasn't that car following y'all, a Pinto.
> Did you see Terry laugh at [that] point? Yes. He
> laughed. I laughed. Because then the next question
> obviously is, well, what kind of car does Marvin have.
> A Pinto. Do you not believe that this man right over
> here knew on the date in question that Marvin had a
> Pinto? Are we saying that Marvin was involved in it?
> Well, why didn't Jimmy tell the police Marvin was
> involved in it? And that the mystery car following
> them was a Pinto? In opening statement I thought
> maybe Freddie Carter had something to do with this?
> But then we discover that Jimmy and Freddie Carter
> knew each other on that day. They were even talking
> to each other around Jackie Ball. So we don't hear so
> much about Freddie anymore, and here we picked up

> with Marvin.   Hypothesis after hypothesis after hypothesis.
>
> The police don't care.   That's always a good smoke screen.   That's always something to talk about. Where are the fingerprints?  Where are the ballistics?

(TR. 775-77).

Dill also complains that the prosecutor asked the jury to find that defense counsel had tried "to confuse" them.  In closing, the prosecutor stated:

> The car we know was more than likely touched by Terry and Jimmy Lee at some point during the day I would assume.  Their prints aren't on it.  Can you insinuate from that, that perhaps there was a wipe-down, wiped clean?  The prints of value that were found, the lifts, we don't know who those prints are. Those prints could have been put on the car three years ago.  They could have been on the stuff inside. They could have been on stuff in the trunk.  But again, ladies and gentlemen, we have no evidence whatsoever that anybody except for Terry or Jimmy related to this case touched the car.  That's something thrown in by Mr. Wilkinson to confuse you.  That's not an issue here.  That's not an issue at all.  Jimmy Lee doesn't even say that, that the killer touched the car ...

(TR. 695-96).

When the statements are placed in context, it is clear that these comments were intended to note that Dill's theory of the case had changed during the course of trial and that Dill was addressing testimony of details not relevant under the defense's theory of the case.  It is equally clear that the comments did not infect the trial with unfairness sufficient to make the resulting conviction a denial of due process.  The adjudication in state court of this claim of prosecutorial misconduct did not result in a decision contrary to or involving an unreasonable application of United States Supreme

Court law nor did it result in a decision that was based on an unreasonable determination of the facts

in light of the evidence presented in the state court proceeding.

> 2.    Prosecutorial misconduct based on the prosecutor's
>        improper comment on Dill's right to remain silent.
>        (See ¶ ¶ 144-47 of amended habeas petition.)

Dill complains of the prosecutor's comments that Terry Dill was the "only one" from which

they heard (R.671), that the medical evidence "negates everything this man right here told you ..."

(R.671), and he further complains that she conducted a rhetorical cross-examination of Dill (R.672).

The Alabama Court of Criminal Appeals held on direct appeal:

> The appellant next contends that the State improperly
> commented on his right to remain silent and on his
> failure to testify. He cites several instances which he
> deems to be reversible error.
>
> The appellant contends that the State improperly
> commented on his right to remain silent during voir
> dire when the prosecutor remarked that "Mr. Dill says
> that someone else did it?" (R. 26). When viewed in
> context, this statement was nothing more than a
> reference to the appellant's statement which was later
> admitted into evidence by the State. *See Grady v.
> State*, 391 So. 2d 1095 (Ala. Crim. App. 1980). The
> comment was in no manner a comment on the
> appellant's right to remain silent.
>
> The appellant also contends that during closing
> arguments the prosecutor referred to the appellant's
> silence by stating that Terry Dill was the "only one"
> from whom the jurors heard. (R. 671). As we read
> the statement in the context of closing arguments, the
> comment was not a comment on the appellant's
> silence. The prosecutor was arguing that Terry Dill
> was the only one who *told the truth* about the
> incident. The prosecutor then went through a lengthy
> summation of all of the testimony which corroborated
> Terry Dill's testimony.     The prosecutor was
> responding to a very lengthy argument by appellant's
> counsel which attacked Terry Dill's credibility.

41

Furthermore, the appellant's statement was admitted into evidence. As we read the argument, it was a proper reply in kind to the appellant's argument and an appropriate comment on the believability of the appellant's version of the incident.

"[W]ide latitude is given the State's prosecutors when a response is made during closing argument to an argument previously made by opposing counsel." *Mitchell v. State*, 480 So. 2d 1254, 1257 (Ala. Crim. App. 1985). *See also Touart v. State*, 562 So. 2d 625 (Ala. Crim. App. 1989). We find no error in the prosecutor's statement. *See, e.g., Sullivan v. State*, 394 So. 2d 76 (Ala. Crim. App. 1981). We note that the appellant failed to object to the comment. Although such failure to object does not preclude review in a capital case, it weighs against any claim of prejudice. *Ex parte Kennedy*, *supra*. Even if the statement was error, it was not so egregious as to "seriously affect the fairness or integrity of the judicial proceedings." *Ex part Womack*, 435 So. 2d 766, 769 (Ala.), *cert. denied*, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983).

600 So. 2d at 355.

The prosecutor argued:

... And Terry Dill was the only one to tell you from the witness stand the whole truth and nothing but the truth that yes, indeed, Leon Shaw and I did drugs together, sold drugs together. Jackie Hall was one of his customers, and his wife was in it just like he was. Terry told you the truth, the only one to tell you the whole truth. You know, even with Leon in the grave people like Jackie Ball and Junatha Shaw can't ever come completely clean. In some perverted way they're still protecting Leon even if it hurts them they don't realize it. They're still protecting Leon.

Well, Terry is trying to help Leon. He is a friend of his. And he is trying to do the right thing, he's trying to do what his Mama told him, tell the truth. Come forward, you didn't do anything wrong, you go up there and you tell what happened, you're the only one

42

to tell what happened. And he is the only one. But why should you believe Terry? What do you have in front of you as evidence in a case to corroborate what Terry Dill said? You have a lot. Every single thing that came from the doctor's mouths corroborate one hundred percent what Terry Dill told you happened, and completely, completely, negates everything that this man right here told you happened out there by the Curb Market.

What did you hear from the doctors? You heard that when the gunshot went off wherever Leon Shaw was, he went down right there. So think about it. Now, the first thing that Mr. Dill tells you is that he was in the car. Well, that makes sense. That's consistent with the way the body was found in the car, in the car, slumped there in the car. But then how do you explain how the bullet got into his head if it didn't come from the back seat? Tell me, Mr. Dill, how did the bullet get there without causing some sort of breakage of glass perhaps in the car, the back windshield, the back window? How do you explain how he was shot if it wasn't from the back seat? Well, take that back. It wasn't from the back left side, the man, the guy, same around to this side right to Leon's window. And I don't know whether Leon was in or out or was half and half, he was almost in, almost in. Well, what is almost in mean? ...

(Tr. 670-72).

When viewed in context, it is evident that the comment that Terry Dill was the only one from which they heard was not a comment on petitioner's silence. Further, the comments about the medical evidence negating everything this man right here told you and the rhetorical cross-examination of Dill were reasonable comments based on the medical evidence and Dill's February 18, 1988 statement to police in which he changed his story when confronted with inconsistencies between the evidence and his version of the events surrounding the shooting. The adjudication in state court of this claim of prosecutorial misconduct did not result in a decision contrary to or

43

involving an unreasonable application of United States Supreme Court law nor did it result in a

decision that was based on an unreasonable determination of the facts in light of the evidence

presented in the state court proceeding.

3.   Prosecutorial misconduct based on the prosecutor's
     improper reference to Dill's pre-arrest silence.
     (See ¶¶ 148-49 of amended habeas petition.)

Dill complains that while questioning the victim's widow, the prosecutor brought out

testimony that Dill failed to discuss the death of her husband with Mrs. Shaw (TR.278-79) and then

argued that Dill did not contact the police until ten days after the victim was killed. (TR.778-79).

On direct appeal, the Alabama Court of Criminal Appeals addressed this issue as follows:

> The appellant next contends that the prosecutor also
> improperly commented on his pre-arrest silence in
> violation of *Ex parte Marek*, 556 So. 2d 375 (Ala.
> 1989). A review of the record reveals that the cited
> remarks were proper replies in kind. The appellant
> strenuously argued during closing argument that
> Terry Dill was not worthy of belief because he did not
> go to the police until four days after the incident. The
> State's response merely pointed out that if Terry
> Dill's version was not worthy of belief because he
> delayed going to the police, the appellant's version of
> the facts was likewise not worthy of belief because he
> also did not go to the police until several days after
> the incident. The prosecutor was simply arguing that
> if Terry Dill's testimony was not credible because of
> the delay, then that reasoning also applied to the
> appellant's version of the facts. In order to determine
> whether a prosecutor's statement is improper, it must
> be examined in its context and in light of what
> transpired, "that is, in light of the preceding argument
> of defense counsel to which the prosecutor's
> argument was an answer." *Henderson v. State*, 460
> So. 2d 331, 333 (Ala. Crim. App. 1984) (citations
> omitted). *See also Touart.* "Remarks or comments of
> the prosecuting attorney, including those which might
> otherwise be improper, are not grounds for reversal
> when they are invited, provoked, or occasioned by

accused's counsel and are in reply to or retaliation for his acts and statements." *Id.*   The prosecutor's comments were a proper reply in kind.  Furthermore, the appellant failed to object to these comments. Thus, this weighs against any claim of prejudice. *Ex parte Kennedy.* Even if the remarks constituted error, they did not rise to the level of plain error. *See Ex parte Womack.*

The appellant finally argues that the prosecutor commented on the appellant's silence when she referred to the appellant's writing a note to his attorney.  As we read the statement in the context of the closing arguments, the comment was again a reference to the appellant's contention that a person outside of the car shot Shaw.  We again note that no objection was made to the remark.  Even if the remark constituted error, it certainly did not rise to the level of plain error. *See Ex parte Womack.*

600 So. 2d at 355-56.

These comments were a proper reply in kind to the defense's attack on the credibility of Terry Dill based on his waiting four days after the shooting to go to the police.  The adjudication in state court of this claim of prosecutorial misconduct did not result in a decision contrary to or involving an unreasonable application of United States Supreme Court law nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

    4.    Prosecutorial misconduct based on prosecutor's campaign of opprobrious characterization of Dill. (See ¶ ¶ 150-52 of amended habeas petition.)

Dill complains that the prosecutor launched into "a metaphysical tirade on the state of Mr. Dill's conscience and, indeed, soul" and quotes from her closing argument.  The Alabama Court of Criminal Appeals held on direct appeal:

The appellant's first claim of prosecutorial misconduct involves a portion of the prosecutor's closing argument at the guilt stage of the trial in which she stated that the appellant believed he could get whatever he wanted and take whatever he needed from anybody. She further stated that the appellant believed that no man could punish him and that God was the only one who could punish him. The argument that the appellant claims to be error constitutes approximately two pages of the record. (R.784-786). The appellant contends that the prosecutor's argument constituted a "metaphysical tirade" and was prejudicial and inflammatory. We note that no objection was made to this portion of the closing argument. We have carefully reviewed the prosecutor's statements. "This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful." *Kuenzel*, (quoting *Johnson v. Wainwright*, 778 F.2d 623, 629, n. 6 (11th Cir. 1985)).

"[C]ounsel in the trial of any lawsuit has the unbridled right (to be sure, duty) to argue the reasonable inferences from the evidence most favorable to his client." *Kuenzel*, (quoting *Ex parte Ainsworth*, 501 So. 2d 1269, 1270 (Ala. 1986)). Prosecutors should be allowed wide latitude in their exhortations to the jury. *Armstrong v. State*, 516 So. 2d 806 (Ala. Crim. App. 1986); *Varner v. State*, 418 So. 2d 961 (Ala. Crim. App. 1982). The conduct by the accused during the trial is a proper subject of comment. *Haywood v. State*, 501 So. 2d 515 (Ala. Crim. App. 1986). Furthermore, "[i]n a proper case, the prosecuting attorney may characterize the accused or his conduct in language which, although it consists of invective or opprobrious terms, accords with the evidence in the case." *Nicks v. State*, 521 So. 2d 1018, 1023 (Ala. Crim App. 1987), *aff'd*, 521 So. 2d 1035 (Ala.), *cert. denied,* 487 U.S. 1241, 108 S.Ct. 2916, 101 L. Ed. 2d 948 (1988).

46

The prosecutor's remarks were legitimate inferences drawn from the evidence or proper comments on the appellant's conduct during the trial. There was evidence presented that the appellant stated that the State would have no case if Terry Dill did not testify. He also stated that the State had no case during the State's closing argument. There was also testimony that several days prior to the trial the appellant stated that he had asked God to forgive him for what he had done and that no one else should punish him for what he had done. Thus, the above-cited portion of the prosecutor's argument was not error. Even if it did constitute error, however, it does not rise to the level of plain error. "Plain error is error which, when examined in the context of the entire case, is so obvious that failure to notice it would seriously affect the fairness, integrity and public reputation of the judicial proceedings." *Kuenzel*, (quoting *United States v. Butler*, 792 F.2d 1528, 1535 (11th Cir.), *cert. denied, Waites v. United States*, 479 U.S. 933, 107 S.Ct. 407, 93 L. Ed. 2d 359 (1986)).

600 So. 2d at 356-57.

In closing the prosecutor stated:

And that brings us right back again to the motive of Terry to lie. There is no motive for him to lie. Every reason in the world for him to take the Fifth, not to say a word, to keep his relative, his friend, out of prison. All he has to do is say I don't know a thing. I was there. I don't know a thing. He can even exonerate him. But Terry Dill is trying in his way to give the system a chance, not use it, not use it, to give it a chance. Never having done so before, he and his mother are trying to give the system a chance. If Terry is lying, then his mother is lying, too. What is her motive to lie, ladies and gentlemen? What is her motive to lie about the number of phone calls that took place from 5 to 6:30 from a high-strung individual calling and calling and calling from Terry, for Terry, for Terry? I guess he wasn't on anything at that time. And coming over to her house that night, and having those conversations about going to Montgomery. She's not lying. That happened. Which leads us up to this Friday, this past Friday, where this man at the end of the table goes on trial for capital murder, and he tries one last time, one last time, to get in touch with Terry to say, Terry, you just tell Terry to come down here and take the Fifth. Because if he doesn't testify, they ain't got no case.

THE DEFENDANT:  They don't.

MRS. PULLIAM:  Judge, we object to the defendant speaking.

THE COURT:  Mr. Dill, be quiet, please, sir.

THE DEFENDANT:  Yes, sir.

MRS. PULLIAM:  Because they ain't got no case.

Acting like the lawyer, advising the Dill family what to do.  Mrs. Dill:  Terry ain't going to do that, Jimmy.  And what does he really believe?  You've seen it first hand this week in his attitude.  What does he really believe?  He believes that he can get whatever he wants and he can take whatever he needs from whomever.  And that he can ask his God to forgive him for that.  And he can have his reckoning with his God and be forgiven.  But no man, no man, can punish him.  If you don't believe that, he sure does.  He believes that no man can punish him for what he did.  He's putting bets on the fact that you won't.  That you will turn your head form the whole sordid mess, from this cancer than [sic] you have seen firsthand.  That you will turn your head from it and say they-re all a bunch of sorry so and so's, who cares.  Who cares that this is going on in Birmingham?  Who cares?  That's what he believes.  He genuinely believes that he can ask forgiveness from God, and that no man can punish him.  Well, we're not talking about punishment.  We're not talking about that right now.  We're talking about accountability.  Holding an individual responsible for his actions.  That's what we're talking about.  And that's what I'm asking you to do.

(TR. 783-86).

A fair reading of the comments placed in context establishes that the adjudication in state court of this claim of prosecutorial misconduct did not result in a decision contrary to or involving an unreasonable application of United States Supreme Court law nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

48

5.     Prosecutorial misconduct based on prosecutor
       improperly asking the jury to do its duty.
       (See ¶¶ 153-54 of amended habeas petition.)

Dill argues the prosecutor improperly expressed her personal opinion at the penalty phase

when she asked that the jury recommend the death penalty and asked the jury to "do your duty."

On direct appeal, the Alabama Court of Criminal Appeals discussed this issue as follows:

> The appellant argues that the prosecutor improperly
> expressed her personal opinion or professional
> judgment during closing arguments. We note that the
> appellant failed to object to any of the instances he
> now cites as error. Although the failure to object does
> not preclude our review in this case, it does weigh
> against any claim of prejudice. *See Kuenzel.* The
> Appellant contends that the prosecutor erred during
> the penalty stage closing argument when she asked
> the jurors to do their duty under the law. Although
> the prosecutor's argument was improper, we do not
> find that it rose to the level of plain error. The
> statements "were not such as to undermine the
> fairness of the trial and contribute to a miscarriage of
> justice." *Martin v. State*, 548 So. 2d 488, 495 (Ala.
> Crim. App. 1988), *aff'd*, 548 So. 2d 496 (Ala.), *cert.
> denied*, 493 U.S. 970, 110 S. Ct. 419, 107 L. Ed. 2d
> 383 (1989) (quoting *United States v. Young*, 470 U.S.
> 1, 16, 105 S. Ct. 1038, 1047, 84 L. Ed. 2d 1 (1985)).
> When looking at the prosecutor's remarks in context,
> it is clear that she was asking the jury to enforce the
> law, and as prescribed by law, impose the death
> penalty. After correctly discussing the applicable
> law, she asked the jurors to do their duty "*under the
> law.*" (R.858.) Thus, although we find that the
> prosecutor's remarks were inappropriate, when
> examined in the context of the entire closing
> argument, they do not rise to the level of plain error.
> *See Kuenzel.*

600 So. 2d at 357.

49

While discussing aggravating and mitigating circumstances at the sentencing phase, the prosecutor

explained the aggravating circumstances in Dill's case:

> ... Ladies and gentlemen, as I did tell you a few moments ago, those particular aggravating circumstances that you will have to consider and to weigh are three.
>
> No. 1, that the capital offense was committed by a person under a sentence of imprisonment.  And the law has been expanded to include not imprisonment but also be under a sentence and having been paroled from it.  As you heard Mr. Newman tell you, he was on February 8, 1988.
>
> No. 2, that the defendant was previously convicted of another felony involving the use or threat of violence to the person.  Certainly I think you can find that going into one's home with a rifle accompanied by another individual with a knife and taking part and holding that knife and having that rifle on another individual to accomplish the purpose of theft is certainly a crime that does involve a great risk of violence or a threat of violence to that person.  And we all know that Jimmy Dill is guilty of that.
>
> No. 3, that the capital offense was committed while the defendant was engaged in a robbery, which is the underlying basis for the capital offense that he's been now convicted of.   Those three aggravating circumstances have been proven beyond all doubt to you.

(TR, 851-53).

> MRS. PULLIAM:   That's certainly aggravation in this case.   And it's certainly something that you can consider.  We talked a little bit about the electric chair before you were selected.  And I told you then to please let it come from here, search your heart and search your guts at the time and tell both me and Mr. Wilkinson whether or not your believed in it, disbelieved in it, and whether or not you would be able to punish somebody under the law if you did believe the aggravating circumstances outweighed the mitigating circumstances, whether you would be able to do it.   And maybe back then, back Monday

> afternoon, it was a lot easier to sit back and say, well, yeah, I could,
> if it were proven to me and I followed the law, I could do it. And I'm
> certain that is going to be the hardest thing that you've ever had to do
> in your life. And it will be something that you will not forget. But,
> ladies and gentlemen, in this case it is something that you can live
> with because you will be following the law.
>
> Why do we have that kind of punishment? Why? We have that kind
> of punishment because society has seen the need for that kind of
> punishment. And someone such as Jimmy Dill, who has had second
> chances, and he chooses to act in the manner that he did, is someone
> that needs to be punished in the most ultimate way. And this is not
> something that I ask you to do for Leon Shaw. This is something that
> I ask you to do for your community. To do your duty, to do your
> duty, under the law. ...

(TR. 856-58).

Upon review of the comments in context, it is clear that the adjudication in state court of this claim of prosecutorial misconduct did not result in a decision contrary to or involving an unreasonable application of United States Supreme Court law nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

6. Prosecutorial misconduct based on prosecutor improperly expressing her personal opinion when she compared Dill's case to an earlier capital murder case. (See ¶ 155 of amended habeas petition.)

Dill complains that the prosecutor improperly compared his case to another capital murder case. On direct appeal, the Alabama Court of Criminal Appeals addressed this issue as follows:

> The appellant also contends that the prosecutor
> improperly argued her personal opinion when
> comparing the appellant's case to an earlier capital
> murder case. During a brief portion of her closing
> argument the prosecutor referred to a prior capital
> murder case in which many people sympathized with
> the victim. She then stated that nobody had sympathy
> for Leon Shaw, that she had no sympathy for him, and
> that she did not ask the jury to have sympathy for

51

> him. Our review of the remarks in the context of the
> prosecutor's entire closing argument reveals that the
> prosecutor was simply asking the jury to convict the
> appellant even though the evidence revealed that the
> victim was a drug dealer. She was asking the jury not
> to allow the victim's character to affect the verdict.
> Her argument may not have been based on facts in
> evidence, but it was certainly not based on her
> personal opinion.   We do not interpret the
> prosecutor's comments as an attempt to cajole the
> jury into reaching a verdict that was based on her
> importance or credibility. *See Kuenzel*. Even if the
> comments constituted error, they do not rise to the
> level of plain error. *See Kuenzel*.

600 So. 2d at 357.

The prosecutor argued:

> ... Ladies and gentlemen, this time last year I stood in
> front of a jury in a capital case, and you could barely
> get in the courtroom. It was packed. Everybody was
> interested in the case. Everybody sympathized with
> the beautiful [girl] who had been killed completely by
> a stranger, innocent, tragic, terrible, terrible death.
> But now this is a capital case. A man is on trial for a
> capital murder, but who cares about Leon Shaw?
> Who gives a flip?  Remember the first day when I
> said who right off the bat thinks, well, this man
> deserves a medal. I was serious. And I didn't see
> anybody raise their hand, but I'll bet you my bottom
> dollar that some of y'all thought good riddance, didn't
> you? If you didn't then, you sure do now, I'm sure.
> So why are we here?  Who does care about Leon
> Shaw? Who cares that this man was assassinated just
> four blocks  from the courthouse?  Who cares that
> he's lying in a grave today?
>
>                    . . . .
>
> Capital murder.  Not like the case last year.  No
> sympathy for Leon Shaw.  I don't ask you to have
> any.    I certainly  don't  have  any.    But  as
> representatives of this community isn't it just as
> important, isn't it just as important to tell Jimmy Dill

52

> that it is against the law, whether it's a drug dealer or
> whether it's an innocent young girl, it is capital
> murder when you take a gun and you assassinate
> somebody to the back of the head, and you rummage
> through their things because you've got a cocaine
> habit. Greed. Habit. Isn't it just as important, ladies
> and gentlemen, for you to tell Jimmy Dill that he must
> be held accountable for what he did? He must be held
> accountable, and he must be punished. This cancer
> has got to be treated. It must be treated. And this is
> your opportunity.

(TR. 664-65,699-700).

The comments Dill complains of were clearly intended to make the point that the verdict must not

be based on the character of the victim. (Tr. 665-65).

The adjudication in state court of this claim of prosecutorial misconduct did not result in a

decision contrary to or involving an unreasonable application of United States Supreme Court law

nor did it result in a decision that was based on an unreasonable determination of the facts in light

of the evidence presented in the state court proceeding.

7.   Prosecutorial misconduct based on prosecutor improperly expressing her opinion
     when she stated that the district attorney's office was not going to give lenient
     treatment to one of the state's witnesses. (See ¶ 156 of amended habeas petition.)

Dill complains that by assuring the jury that Junatha Shaw would not get lenient treatment

the prosecutor rebutted any inference that the witness had testified favorably to curry good will with

the prosecutors.

The Alabama Court of Criminal Appeals held on direct appeal:

> The appellant next contends that the following
> argument of the prosecutor constituted an improper
> expression of personal opinion or professional
> judgment concerning one of the witnesses:
>
>> Junatha Shaw, mother of two, two prior felony
>> convictions for drugs, and shooting into an

> occupied dwelling, with a revocation pending
> on a theft case.  She will get no sympathy I
> can guarantee from my office.  But she can't
> stop either.  (R.669).
>
> When viewed in context, these remarks were part of
> an argument on the character of the witness based on
> the evidence presented.  Furthermore, the witness
> testified that she was not going to receive anything
> from the district attorney's office in exchange for her
> testimony and thus rebutted any inference to the
> contrary.  When viewed in context, the prosecutor's
> comments were legitimate inferences based on the
> evidence.  "[A] criminal conviction is not to be lightly
> overturned on the basis of a prosecutor's comments
> standing alone, for the statements or conduct must be
> viewed in context; only by so doing can it be
> determined whether the prosecutor's conduct affected
> the fairness of the trial."  *United States v. Young*, 470
> U.S. at 11, 105 S. Ct. at 1044.   Although the
> prosecutor could have chosen more appropriate
> language to make the same argument, her comments
> do not constitute reversible error.  Furthermore, the
> appellant failed to object to this portion of the closing
> argument.  Even if error, the comments certainly do
> not rise to the level of plain error.  *See Kuenzel*; *Ex
> parte Womack*.

600 So. 2d at 358.

The prosecutor's comments about Ms. Shaw were proper in light of Ms. Shaw's testimony

that she was not going to receive anything from the district attorney's office in exchange for her

testimony.  The adjudication in state court of this claim of prosecutorial misconduct did not result

in a decision contrary to or involving an unreasonable application of United States Supreme Court

law nor did it result in a decision that was based on an unreasonable determination of the facts in

light of the evidence presented in the state court proceeding.

54

8.      Prosecutorial misconduct based on prosecutor
        improperly vouching for the credibility of state
        witnesses.  (See ¶ 157 of amended habeas petition.)

In support of his claim that the prosecutor improperly vouched for the credibility of Terry

Dill, Dill points out that the prosecutor made comments indicating that she was aware of Terry Dill's

"business transactions" because he had answered to her about all of them.

On direct appeal, the Alabama Court of Criminal Appeals addressed this issue as follows:

> The appellant also contends that during her closing
> argument, the prosecutor vouched for the credibility
> of eyewitness Terry Dill.  We have carefully reviewed
> the record and find that although the prosecutor's
> remarks were inappropriate because they were based
> on facts not in evidence and could arguably be
> interpreted as vouching for the credibility of the
> witness, the remarks did not constitute reversible
> error.  The thrust of the prosecutor's argument was
> that Terry Dill had already admitted to being a drug
> dealer so he had no reason to lie about what
> happened.  This argument was made in response to
> the appellant's strenuous attack on Terry Dill's
> credibility.

600 So. 2d at 358.

In the context of discussing inconsistencies in Terry Dill's testimony, the prosecutor argued:

> MRS. PULLIAM:   So those are the inconsistencies in the fifteen pages of Terry Dill.
>                 That's it.  Now, out of any of that do you see any reason in the world
>                 that he would lie to you or to the police about any of those things
>                 when he is there to testify and certainly does admit his Cocaine
>                 dealing in the statement, does admit to the fact that Leon had Cocaine
>                 on him at the time?  He's not trying to hide anything about Cocaine,
>                 about what he's involved with.  From the 12th of February on he has
>                 not tried to hide it.  He wasn't asked in vivid detail about his business
>                 transactions by the police that day, but he certainly has answered to
>                 me about every single one of them, and –
>
> MR. WILKINSON:  We object.
>
> MRS. PULLIAM:   – he's told you about every single one of them.

55

MR. WILKINSON:    We don't object to what he's told.  But any conversations he might have had with Mrs. Pulliam, I don't think she can testify to.  And I object to that.

THE COURT:    Well, I sustain that.

MRS. PULLIAM:    Certainly everything he's testified from the witness stand you know that I've heard it before.

MR. WILKINSON:    Object.

THE COURT:    Well, sustained.

MRS. PULLIAM:    Certainly you can infer that I do talk to my witnesses before I bring them into court, ladies and gentlemen.  Now, let's talk about Terry Dill's motive to lie, all right?  And I think we are forgetting one very important thing in this case.  Jimmy Dill is just not some person on the street to Terry Dill or to Mrs. Dill.  This isn't some stranger to them.  All right.  This is their blood relative, Mrs. Dill's husband's brother, that has grown up, associated with their family for his entire life here in Birmingham.  You cannot forget that.  A man that Terry Dill has associated with his whole life, his uncle.  Close to his age, schools together, using Cocaine together, riding around together, talking together, drinking beers together.  What is his motive to lie in a capital murder case against someone that is his blood relative?

(TR.769-71).

The comments allegedly vouching for Terry Dill were responsive to the defense's attacks on Terry Dill's credibility and alleged inconsistencies in his testimony.

The adjudication in state court of this claim of prosecutorial misconduct did not result in a decision contrary to or involving an unreasonable application of United States Supreme Court law nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

C.    Trial court should have granted a mistrial because a police officer made references during his testimony to Dill's prior criminal record.  (See ¶¶ 158-62 of amended habeas petition.)

Dill complains that the trial court erred in failing to grant a mistrial when Sgt. Duncan made a reference to Dill's prior criminal record when he testified as follows:

> Q:    After Terry Dill made a statement what, if anything did you or Lieutenant Jordan do?
>
> A:    I attempted to locate Jimmy Dill.
>
> Q:    All right, how did you attempt to do that?
>
> A:    By several means.  Through some of his relatives and through his parole officer.

(Tr. 619-20).

Trial errors raised in habeas proceedings are reviewed under the harmless error standard under which a reversal is required only if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), quoting *Kotteakos v. United States,* 328 U.S. 750, 776 (1946).

The Alabama Court of Criminal Appeals addressed this issue on direct appeal:

> The appellant first contends that the trial court erred in failing to grant a mistrial when Officer Forrest Duncan referred to the appellant's parole officer during his testimony.  The appellant did not object to the testimony.  The record reveals that the following occurred during the direct examination of Officer Duncan:
>
> Q:    After Terry Dill made a statement, what, if anything, did you or Lieutenant Jordan do after that?
>
> A:    I attempted to locate Jimmy Dill.
>
> Q:    All right.  How did you attempt to do that?

A:    By several means.   Through some of his relatives and through his parole officer.

Q:    And did this start on the very day that Terry Dill made the statement, did your efforts start then?

(R.619-620).  Following this exchange, this subject was never raised again either on direct or on cross-examination.  Following Duncan's testimony and out of the jury's presence, the appellant moved to exclude the statement and moved for a mistrial.  The court denied the motion for mistrial but offered to instruct the jury to exclude the statement.  The appellant asked for time to think about the offer.  The appellant later refused the offered curative instruction because such an instruction might further emphasize the statement.

Although the failure to object does not preclude review in a capital case, such failure weighs against any claim of prejudice. *Kuenzel*; *Ex parte Kennedy*, 472 So. 2d 1106 (Ala.), *cert. denied,* 474 U.S. 975, 106 S.Ct. 340, 88 L. Ed. 2d 325 (1985).  "Plain error is error which, when examined in the context of the entire case, is so obvious that failure to notice it would seriously affect the fairness, integrity, and public reputation of the judicial proceedings." *United States v. Butler*, 792 F.2d 1528, 1535 (11th Cir.), *cert. denied, Waites v. United States*, 479 U.S. 933, 107 S.Ct. 407, 93 L. Ed. 2d 359 (1986).

We find that the testimony does not rise to the level of plain error.  The statement was elicited incidentally and was never mentioned again.  The appellant did not object to the statement.   Furthermore, the appellant refused an offer of curative instructions by the court.  We note that "'an indirect reference to the defendant's involvement in other crimes is not incurably harmful to the accused, and any possible prejudice may be eradicated by the trial judges's prompt curative instruction to the jury.'" *McDonald v. State*, 516 So. 2d 868, 871 (Ala. Crim. App. 1987) (quoting *Brooks v. State*, 462 So. 2d 758, 760 (Ala. Crim. App. 1984)).  *See also Kendrick v. State*, 444 So. 2d 905 (Ala. Crim. App. 1984).  Our review of the

58

> record leads us to conclude that the appellant believed that the statement attracted so little attention that a curative instruction was unnecessary or that, by refusing a curative instruction, the appellant was attempting to invite error. When examined in the context of the entire case, we do not believe that the statement was so egregious that it "seriously affect[ed] the fairness, integrity or public reputation of [the] judicial proceedings." *Hooks* at 351-352.

600 So. 2d at 351-52.

The Alabama Supreme Court addressed this claim on petition for writ of certiorari and affirmed:

> In its opinion, *Dill v. State*, 600 So. 2d 343 (Ala. Crim. App. 1991), the Court of Criminal Appeals set out the context of this reference. For this discussion, it is enough to note that during his testimony an officer of considerable law enforcement experience referred to an attempt to locate the defendant "through his parole officer." The defendant points out, quite correctly, that this is a significant error. In other cases and under other facts, gratuitous references, even indirect ones, to past criminal activity have required the reversal of criminal convictions. See, e.g., *Ex parte Johnson*, 507 So. 2d 1351 (Ala. 1986); *Tabb v. State*, 553 So. 2d 628 (Ala. Crim. App. 1988).
>
> Under the circumstances of this case, we view this inappropriate reference to prior criminal activity in the context of the plain error rule. We recognize the various formulations of the plain error rule set out in *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), and its progeny in this state. See *Ex parte Hinton*, 548 So. 2d 562 (Ala.) *cert. denied,* 493 U.S. 969, 110 S.Ct. 419, 107 L. Ed. 2d 383 (1989); *Kuenzel v. State*, 577 So. 2d 474 (Ala. Crim. App. 1990), *affirmed,* 577 So. 2d 531 (Ala. 1991); *Hooks v. State*, 534 So. 2d 329 (Ala. Crim. App. 1987), *affirmed*, 534 So. 2d 371 (Ala. 1988). However, the "plain error" principles we apply are set out by both statute and court rule.

Ala. Code 1975, § 12-22-241, provides:

> In all cases of automatic appeals, the appellate court may consider, at its discretion, any testimony that was *seriously prejudicial* to the rights of the appellant and may reverse thereon, even though no objection was made thereto. The appellate court shall consider all of the testimony; and, if upon each consideration it is of opinion the verdict is so decidedly contrary to the great weight of the evidence as to be wrong and unjust and that upon that ground a new trial should be had, the court shall enter an order of reversal of the judgment and grant a new trial, though no motion to that effect was presented in the court below.

(Emphasis added.) See also Ala.R.App.P. 39(k), providing that in death penalty cases this Court "may notice any plain error ... and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial rights of the petitioner."

After a close examination of the record, we note the following facts: (1) the reference to the defendant's parole officer was incidental and was not the main point of the officer's testimony; (2) the reference was not repeated or highlighted in later testimony; (3) the defense intentionally did not object to the reference; (4) when, out of the presence of the jury, the defendant moved to exclude the reference and for a mistrial, the defense intentionally refused the trial court's offer of curative instructions; (5) the trial court, which heard the testimony and saw the effect, if any, on the jury denied the defendant's motion for a mistrial; and (6) the record in this case contains repeated references, properly in evidence, to drug sales and other illegal activity on the part of Dill.

These facts, when considered under the plain error principles set out in Ala. Code 1975, § 12-22-241, and Ala.R.App.P. 39(k), cause us to agree with the Court of Criminal Appeals that the reference to the defendant's parole officer did not rise to the level of "plain error."

600 So. 2d at 373-374.

Because the reference to Dill's prior criminal record was extremely brief and the weight of evidence of guilt was great, the refusal to grant a mistrial, if error, was harmless error.

The adjudication in state court of this claim did not result in a decision contrary to or involving an unreasonable application of United States Supreme Court law nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

D.    Prosecutor utilized her peremptory challenges in a racially
      discriminatory manner.  (See ¶ ¶ 163-70 of amended habeas petition.)

Dill alleges that the prosecutor used peremptory challenges to strike six of the twelve qualified black jurors and then sought to defend her challenges by asserting "on any case that I try, especially any case that has anything to do with drugs, my primary concern or the most favorable juror in my opinion for the State is one who is older who is married and who has a stable job and preferably children." (Tr. 180-81).  Dill argues that this rationalization fails to rebut the *prima facie* case of bias because the state did not strike all single white jurors (specifically James W. Holt and Howard Bishop), because the state did not inquire into any actual attitudes of those persons rejected due to the fact that they were unmarried, because the "stable job" criteria is not race neutral, and because Jefferson County has a history of racial discrimination.

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the United States Supreme Court held:

> ... [A] defendant may establish a prima facie case of
> purposeful discrimination in selection of the petit jury
> solely on evidence concerning the prosecutor's
> exercise of peremptory challenges at the defendant's
> trial.  To establish such a case, the defendant first
> must show that he is a member of a cognizable racial
> group, ... and that the prosecutor has exercised
> peremptory challenges to remove from the venire

61

> members of defendant's race. Second, the defendant
> is entitled to rely on the fact, as to which there can be
> no dispute, that peremptory challenges constitute a
> jury selection practice that permits "those to
> discriminate who are of a mind to discriminate."
> Finally, the defendant must show that these facts and
> any other relevant circumstances raise an inference
> that the prosecutor used that practice to exclude the
> veniremen from the petit jury on account of their race.
> This combination of factors in the empaneling of the
> petit jury, as in the selection of the venire, raise the
> necessary inference of purposeful discrimination.
> [Citations omitted].
>
> . . .
>
> Once the defendant makes a prima facie showing, the
> burden shifts to the State to come forward with a
> neutral explanation for challenging black jurors.

*Batson*, 476 U.S. at 95-97.[13]

In *Powers v. Ohio*, 499 U.S. 400 (1991) the Supreme Court held that under the equal

protection clause, a defendant has standing to object to race-based exclusion of jurors through

peremptory challenges whether or not the defendant and excluded jurors share the same race.

Petitioner, however, complains only of the strikes of black jurors.

On direct appeal, the Alabama Court of Criminal Appeals held:

> The appellant next contends that the State exercised
> its peremptory strikes to remove black jurors from the
> jury venire in violation of *Batson v. Kentucky*, 476
> U.S. 79, 106 S.Ct. 1712, 90 L. Ed. 2d 69 (1986). The
> record reveals that there were 13 black jurors on the
> jury venire. The State struck six black jurors and the
> appellant struck one. Six black jurors served on the
> jury. Although the trial court found that the appellant

---

[13]/     The *Batson* decision applies only to cases challenging convictions that became final after the Supreme Court's opinion was announced on April 30, 1986. *Allen v. Hardy*, 478 U.S. 255 (1986). Petitioner's conviction became final in 1993 when the United States Supreme Court denied certiorari. Therefore, *Batson* is applicable to this case.

did not present a *prima facie* case of racial discrimination, it required the prosecution to state the reasons for its strikes. The appellant argues that the State did not strike one white juror who had the same characteristics as the black jurors who were struck. The record reveals that the prosecutor planned to strike all single jurors. She stated that the most favorable juror in a case involving drugs is one who is older, married, with a stable job and children. The prosecutor stated that the white, single juror was left on the panel accidentally. She thought he had already been struck for cause. Apparently, she showed the trial court her strike sheet which indicated that she had marked through that juror's name as having been struck. The record reveals that the black jurors who served on the jury had substantially those characteristics she stated made a favorable juror. An older, single, white juror was also struck by the State even though she otherwise appeared to be a good juror, as was a single white male.

We need not address the issue of whether the appellant presented a *prima facie* case of racial discrimination, as it is clear from the record that no such discrimination occurred. Prior decisions of this court have held that age, marital status and employment status may be race-neutral reasons for striking jurors. *Warner v. State*, 594 So. 2d 664 (Ala. Crim. App. 1990); *Stephens v. State*, 580 So. 2d 11 (Ala. Crim. App. 1990), aff'd, 580 So. 2d 26 (Ala. Crim. App. 1991). We find the reasons given by the prosecutor to be race-neutral under the circumstances of this case. Furthermore, the record reveals that the State struck white jurors for substantially the same reasons as black jurors. "Such evidence of neutrality may overcome the presumption of discrimination." *Bedford v. State*, 548 So. 2d 1097, 1098 (Ala. Crim. App. 1989). We find that the State did not use its peremptory strikes in a racially discriminatory manner. *See, e.g. Singleton v. State*, 553 So. 2d 689 (Ala. Crim. App. 1989); *Bedford; Mathews v. State*, 534 So. 2d 1129 (Ala. Crim. 1988).

600 So. 2d at 354.

63

The transcript reflects that the following occurred:

MS. VINSON:            All right.  Judge, we would make a *Batson* motion in this case.

        ...

BAILIFF FELTS:         The defense struck one.

MS. VINSON:            Right.  And we would show that the defendant is of a minority race. And we would ask for prosecutor to go ahead and give her reasons for striking the blacks.

THE COURT:             Well, it's my understanding we had thirteen on the venire we struck from.  The State struck six, the defendant struck one.  That leaves us with six black jurors; is that correct?  Are my calculations correct?

MR. WILKINSON:        I think that's probably true, Judge.  Our point was simply that as we understand the law under Branch and Batson not even one juror can be struck for a racial reason.  It must be a non-racial legitimate reason for striking any regardless – I'm not quarreling with your figures.  I think they're accurate.  But regardless of that we think that the State should afford for the record its rationale for striking them.

THE COURT:             What indication at this point is there that any of these strikes were done on a racial basis?

MR. WILKINSON:        Because we think there were white jurors that exhibited similar characteristics as black jurors who were struck and were not struck. And the defendant is a member of a minority race, and I think that's sufficient.

MRS. PULLIAM:         Judge, just for the record would the Court inquire of the defense what white jurors were left on that exhibited the same characteristics?

THE COURT:             Well, I think that's a fair question.

MS. VINSON:            Well, the only common characteristic I can find among the black jurors that were struck were that – I'm trying to see if all of them, I hesitate to say all of them – but most of them I have noted were single.

MRS. PULLIAM:         All were.

MS. VINSON:            Now–

| | |
|---|---|
| MRS. PULLIAM: | As were all whites that were struck. |
| MS. VINSON: | Well, now just looking at the No. 5 you struck, Juror Argo, I believe she's married. I had a notation her husband was retired. No. 6 you struck, Connie Austin, her husband works for Thompson Tractor. |
| MRS. PULLIAM: | These were white, though. |
| MS. VINSON: | I know. But I thought you said that all your blacks were single as were other white jurors you struck. Did I misunderstand what you said? |
| MRS. PULLIAM: | They were the only white single individuals. |
| MS. VINSON: | I believe No. 81, Mr. Holt, is single. He's white. |
| MRS. PULLIAM: | No. |
| MS. VINSON: | I believe Mr. Bishop, No. 10, he's white. And he's single. I can't remember if he's divorced or widower. And those people are single people who were not struck by the State. |
| MRS. PULLIAM: | All right. Would you give those numbers again because I certainly don't show that any white single person was left on the jury? |
| MS. VINSON: | Okay. No. 81, Mr. James W. Holt. |
| MRS. PULLIAM: | Where is he? |
| MS. VINSON: | He is on the row right in front of us, that row inside the bar. He's an auto mechanic. I have single written down here. |
| MRS. PULLIAM: | As the Court can see, I have by accident I can assure the Court because I certainly would have struck that individual, I have him marked out and struck for cause right here on my sheet. The Court can certainly take notice of that. And certainly had I known he was left he would have been struck. Not just because he was single, but for other reasons as well. |
| MS. VINSON: | And also No. 10, Howard Bishop, who was in the jury box, he is on medical disability. I believe he said he was single. |
| MRS. PULLIAM: | He did say, though, that he had children. That's why I left him on because I assumed he was divorced. As was – Well, if the Court finds that I should go through my reasons, I'm prepared to do so. |

| | |
|---|---|
| THE COURT: | Well, for the record I would say that there's no indication at this point to the Court that there was any racially-based strikes on the part of the State. But it might be helpful for the State just to give us the reasons at this point. |
| MRS. PULLIAM: | Judge, on any case that I try, especially any case that has anything to do with drugs, my primary concern or the most favorable juror in my opinion for the State is one who is older who is married and who has a stable job and preferably children. Therefore, my primary concern first was to strike every single individual that was on the venire, which I did, with the exception that's been pointed out to me to my chagrin, Mr. Holt, that I have already marked out for cause on my sheet by accident. Every other individual that is single is off the jury with the exception I might point out of two black females, one being Ms. Marsh, I believe, who indicated that her son had been robbed, which led me to believe that she perhaps at one time had been married or certainly she had children as well as a stable employment, and she was very attentive. So I made an exception with her as well as with Ms. Debra Staffney, who is Juror No. 155, who is also a black female. She indicated that she had not gotten married yet. She appeared, however, to be quite older or older to me with a good job at Sears in the credit department. And those are the only two single individuals that I left, and for those two particular reasons I made an exceptions [sic]. The white single jurors that were struck were Juror No. 65, who is a single white female, was struck for that reason. Otherwise, she appeared to be a good juror, but I did strike her because she was single. As well as Juror No. 48, who is a young white male, who I struck for that reason as well. |
| THE COURT: | Anything else? |
| MR. WILKINSON: | No, no. |
| THE COURT: | All right. I deny your motion. |
| MRS. PULLIAM: | Let me also point out for the record that the victim in the case is black, and all witnesses in the case with the exception of the police officers and the medical people are black as well. |
| THE COURT: | All right. Anything else? |
| MR. WILKINSON: | No, sir. |
| THE COURT: | All right. I deny your motion, overrule it. |

MR. WILKINSON:    We except.

(TR. 175-183).

The transcript indicates that the criteria which controlled the state's decision with regard to strikes were marital status and parental status and that the state applied this criteria evenly with respect to black and white jurors with the exception of Juror Holt who was accidently left on the jury because the state mistakenly indicated on its strike sheet that he was struck for cause.  There is no indication in this case that the state considered whether the jurors had "stable jobs."  In any event, the court concludes that the adjudication in state court of this *Batson* claim did not result in a decision contrary to or involving an unreasonable application of United States Supreme Court law nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

## PROCEDURALLY DEFAULTED CLAIMS

Dill did not present four of his claims in state court before raising them here:

A.6.    Ineffective assistance of trial counsel based on trial counsel's failure to object to the trial court's jury instruction on non-statutory mitigating circumstances.  (See ¶¶ 107-09.)

A.17.   Ineffective assistance of trial counsel based on trial counsel's failure to object when Dill was forced to appear before the jury in jail clothes. (See ¶¶ 138-140.)

G.      The claim that the inclusion of a juror who was related to the trial judge violates his constitutional rights. (See ¶¶ 171-174 of amended habeas petition.)

F.      The claim that the state failed to turn over investigative materials regarding an investigation into whether the victim's wife purposefully or negligently caused the victim's death.  (See ¶¶ 175-77 of amended habeas petition.)

In *Teague v. Lane*, 489 U.S. 288 (1989), the Supreme Court held that the procedural default rule applies where a claim has never been presented to the state courts. "A state prisoner may not obtain federal habeas corpus relief absent a showing of cause and actual prejudice." *Engle v. Isaac*, 456 U.S. 107, 129 (1982). Dill has failed to respond to respondents' argument that these claims are procedurally defaulted and, as a result, he has failed to show either cause for his procedural default or prejudice resulting therefrom.

Based on the foregoing the petition for writ of habeas corpus is due to be denied. A separate final judgment consistent with this memorandum of opinion will be entered simultaneously herewith.

DONE this the ____3lst____ day of March, 2004.

Sharon Lovelace Blackburn

SHARON LOVELACE BLACKBURN
UNITED STATES DISTRICT JUDGE